WHALEY, APPELLEE, *v.* WHALEY, APPELLANT.

[Cite as Whaley v. Whaley (1978), 61 Ohio App. 2d 111.]

(No. 1351—Decided December 4, 1978.)

*Mr. John Wolfe,* for appellant.

*Mr. J. B. Collier,* for appellee.

GREY, J. This is an appeal from the Lawrence County Court of Common Pleas. The record discloses the following facts. On April 8, 1977, the marriage of Robert and Virginia Whaley was dissolved with Mrs. Whaley being given custody of the couple's four year old daughter. In October 1977, custody was changed to Mr. Whaley. The court's decision was based on the grounds that Mrs. Whaley was romantically interested in a married man who was planning to divorce his wife and marry Mrs. Whaley. This court granted a stay pending appeal.

From the decision this appeal was taken, assigning two errors:

"1. The Court failed to comply with the statutory requirements of Section 3109.04, Ohio Revised Code, thus committing prejudicial error.

"2. The Court committed prejudicial error in substituting his personal opinion of morality for that of the community or society in general."

The assignments of error will be treated together.

Under R. C. 3109.04 (B), a court may not modify a prior custody decree unless it finds that there has been a change in circumstances and that a change of custody is in the best interest of the child.

R. C. 3109.04 (B) specifically provides:

"The court *shall not modify* a prior custody decree unless it finds, based on facts which have arisen since the prior decree or which were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child." (Emphasis supplied.)

This section and the prior statutes dealing with custody have all been construed to hold that a court may modify a custody award *only if* there has been a change of circumstances. *Trickey* v. *Trickey*, (1952), 158 Ohio St. 9, *Palladino* v. *Palladino* (1971), 27 Ohio St. 2d 175.

It should be noted here that a decree in a divorce case awarding custody is a final judgment. A final judgment is conclusive and binds the parties. This principle of the finality and conclusiveness of judgments is basic to our system of law. 32 Ohio Jurisprudence 2d 377, Judgments, Section 178; 46 American Jurisprudence 2d 548, Judgments, Section 379. The underlying reason for this rule is clear: in any case there must be an end to the litigation. The rule of finality and its underlying reasons apply in divorce and custody cases, and particularly so. Indeed, the hurt, the loss, the rancor, and the bitterness which attend so many divorce actions require that the courts terminate these cases with certainty and finality so that parties can accept the decision, adjust to the reality of it, and get on with their individual lives.

The principle of finality is particularly necessary in custody cases because of the special needs of a child. A child needs a continuing relationship with the person who cares for him, and any time that continuity is broken the child suffers. This is so well known as to be almost beyond contradiction. It is a matter of common knowledge to any parent, grand-parent, or foster parent and has been documented by many studies. *The Writings of Anna Freud,* New York International University Press, 1973: See volume 3 wherein the problems of children separated from their parents during

World War II are discussed, or volume 7, page 247, wherein the circumstances which gave rise to *Painter* v. *Bannister* (1966), 258 Iowa 1390, 140 N.W. 2d 152, *certiorari* denied, 385 U. S. 949, are discussed with particularity. Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, (The Free Press 1973.)* Courts must be aware that any change of custody will have some, perhaps grave, consequences for the child.

To be sure, people and circumstances change. As a result, there is engrafted on the rule of the finality of judgments an exception allowing courts continuing jurisdiction and the power to modify prior custody orders. One should always bear in mind however that a modification of custody is the exception and not the rule. Too often a motion for a change of custody is used by one disgruntled party to continue the battle, and worse, the battleground becomes the children of the parties.

The legislature sought to prevent this all too common occurrence in passing R. C. 3109.04. Part (A) of that statute deals with the initial granting of custody. Part (B) begins, significantly,

"The court *shall not modify* a prior custody decree***." (Emphasis supplied.)

The statute goes on to allow a change of custody if there has been a change of circumstances, and if that change of circumstances necessitates a change of custody to serve the best interest of the child. The statute emphasizes the legislative intent by providing:

"***in applying these standards, the court *shall retain the custodian designated by the prior decree,* unless one of the following applies:

"(1) The custodian agrees to a change in custody.

"(2) The child, with the consent of the custodian, has been integrated into the family of the person seeking custody.

"(3) The child's present environment endangers significantly his physical health or his mental, moral, or emotional development and the harm likely to be caused by a

* While this writer agrees with the analysis of the problem as described by Messrs. Goldstein, Freud & Solnit, I cannot entirely agree with their suggested solutions.

change of environment is outweighed by the advantages of such change to the child." (Emphasis supplied.)

Applying the clear language of the statute to this case, we find that the record is devoid of any showing of a change of circumstances in the child or the custodian, or that the child has been neglected, injured or harmed in any way. The sole basis for the motion to modify was that appellant was seeing a married man, who was separated from his wife and seeking a divorce, and that the two of them hoped to get married. On cross examination the appellee answered the following question:

"Q. So in fact, you don't deny that, with the exception of your judgment of Buddy Bell's being at the house, you do not deny that Ginny's a good mother, do you?

A. No."

"The trial court in its decision made no findings that there had been a change in circumstances, nor that the present environment was harmful to the child. Rather, it made the following finding:

"You see Ma'am, you and Mr. Bell apparently have violated the most sacred contract anyone ever enters into, and that's a marital relationship. The fact that you have this affection for him doesn't change your obligations. *It would be wrong for the Court to permit it to continue, and it would be especially wrong if you and Mr. Bell* ultimately get married, that two people who apparently have caused the problem and have forsaken your spouses *would be the beneficiaries of, of the child."* (Emphasis supplied.)

The judge's decision demonstrates that the change in custody was ordered to punish Mrs. Whaley for conduct the court considered morally wrong.

This is not the standard in the state of Ohio. R. C. 3109.04; *McVay* v. *McVay* (1974), 44 Ohio App. 2d 370. The state is concerned with the child's welfare. *Heiney* v. *Heiney* (1973), 40 Ohio App. 2d 571. A child must not be used to punish or reward conduct a particular judge might condemn or condone.

In *Beamer* v. *Beamer* (1969), 17 Ohio App. 2d 89, where a mother was living in an adulterous relationship with a married man and bore him a child, custody was changed to the father. The decision was affirmed. In its opinion, the Third

District Court of Appeals noted that a court's inquiry into the moral standards or conduct of a custodial parent is limited to a determination of the effect of such conduct on the child.

"The plaintiff contends this is an indirect means for punishing her for misconduct. This is not to be maintained. The criterion is: what is for the best interest of the children, and her conduct is here material only so far as it affects this question." (Page 97.)

If then the issue of immoral conduct by the custodial parent is relevant only to the extent that it affects the child, what standard is to be used by a trial court in deciding such a question? In a well written article by Lauerman, *Nonmarital Sexual Conduct and Child Custody*, 46 Cin. L.R. 647 (1977), various standards are set forth. In the interest of brevity we shall attempt to summarize those standards.

Where a custodial parent engages in nonmarital sexual conduct. (1) it is conclusively presumed that the person is unfit to have custody or (2) it is rebuttably presumed that the person is unfit to have custody, or (3) it must be shown that such conduct has a direct adverse impact on the child, or (4) it is presumed that such conduct has a direct adverse impact on the child.

The author gives her opinion, at page 670, as to the standard to be followed.

"Of the four approaches to custody disputes involving parental nonmarital sexual conduct, three—the conclusive disqualification rule, the presumptive unfitness position, and the presumptive direct adverse impact stance—are unsatisfactory. The direct adverse impact rule, however, is very satisfactory, assuming a certain mode of application is adopted. The assumption upon which the conclusive disqualification and presumptive unfitness rules are premised, namely, that a sexually active parent necessarily or probably lacks the ability to be a good parent, is invalid simply because it is untrue in many cases. Although these approaches may each have the advantage of producing relatively consistent results, both positions appear to aim more at punishing the parent than at furthering the best interests of the child. In cases in which the child is not likely to be affected by parental sexual conduct and might benefit from the offending parent's care (as, for instance, where the mother is the sexually active

parent and the child is very young), use of either the conclusively disqualified rule or the presumptive unfitness test punishes the child as well as the parent. Since the best interests of the child and not the punishment of either parent or child should be the polestar in custody cases, summary espousal of the conclusively disqualified rule or of the presumptively unfit approach constitutes an unacceptable judicial attempt to enforce a particular moral code, a moral code which is by no means accepted by everyone. That some courts have carved out exceptions to the conclusive disqualification rule which emphasize consideration of the child's welfare rather than parental character may reflect at least limited recognition of this proposition."

While legal scholars may posit what the law ought to be, the courts are bound by the law as it is. The issue here then becomes which, if any, of these standards applies in Ohio.

It would appear that the first two standards, conclusive or presumptive unfitness, are not the rule in Ohio. Traditionally, *Gishwieler* v. *Dodez* (1855), 4 Ohio St. 615, and currently *Boyer* v. *Boyer* (1976), 46 Ohio St. 2d 83, indicate that the standard is the best interests of the child. The trial court may not rely on bare legal conclusions or presumptions, but "***shall consider all relevant factors***" as set out in R. C. 3109.04 (C).

The fourth standard, that immoral conduct is presumed to have a direct adverse impact on the child, was the one apparently used by the trial court. In his opinion, the court said:

"I think that what is most disturbing is that both Mrs. Whaley and for that matter Ma'am, your parents, I don't question that they're good people, but I question your moral judgment. The testimony is that you don't see anything wrong with dating and having a romantic interest with a married man, and from your parents' testimony, your father's testimony, he said he didn't see anything wrong with it either under the circumstances, and your mother really never testified to that effect, or that fact, if in fact it is, but she did accompany you and the granddaughter to Myrtle Beach where you had certainly at the very least an improper relationship with a married man. *So if you extend that line of reasoning, if your moral judgment is that warped in my opin-*

*ion at least, then I can't trust your judgment in other incidents.*" (Emphasis added.)

We find this a difficult and unworkable standard. It is difficult because it requires the court to reach a decision on matters not in evidence, but on a possible future harmful impact on the child. It is unworkable because it requires the court to determine what is moral and immoral, and requires the parties to speculate on what is and what may become "morally acceptable." In *In re Anonymous* (1962), 37 Misc. 2d 411, 412, 238 N.Y.S. 2d 422, 423, we have this language:

"***It therefore has devolved upon the courts to establish the moral standards to be followed by persons to whom is entrusted the care and custody of children. And never has there been a greater need for the courts to maintain a high level of moral conduct than exists today. ***Our courts will continue to insist upon a high level of moral conduct on the part of custodians of children, and will never succumb to the 'Hollywood' type of morality so popular today, which seems to condone and encourage the dropping of our moral guard."

A mere 13 years later, about the time it takes to raise a child to junior high school age, we have this:

"***Residence together of an unmarried male and female without the benefit of a sermonized marriage is not per se evil nor one of immorality.***The criterion to be applied to determinations of custody is not whether the court condones the mother's mode of living or considers it contrary to good morals, but whether the child is best located with the mother and there well behaved and cared for." *S. v. J.* (1975), 367 N.Y.S. 2d 405, 410.

These two cases exemplify the problem for both the parents and the courts. If immoral conduct is presumed to be harmful, the party seeking a change of custody need not show a change of circumstances which is harmful to the child—that is presumed. The burden of proof on that party is to show "immorality," and impliedly to prove a moral norm which the custodial party has violated. Disregarding the momentous constitutional implications of such a standard, and in light of the diversity of religious and moral practice in this country we find it simply an unworkable standard beyond the realm of ligitimate judicial inquiry.

118

The third standard, that immoral conduct must be shown to have a direct or probable adverse impact on the welfare of the child in order to justify a change of custody, we believe to be the rule in Ohio. We believe it to be the better standard. While a court should not inquire into competing moral value systems, it can recognize that such moral standards do exist, and that children are harmed by being raised in immoral surroundings. With this standard the court looks not to moral systems, but to the interests of the child. A court need not classify certain conduct as a "wicked sin" or "mere indiscretion"; rather, it looks only to the effect, if any, the conduct has on the child.

To be sure this standard may give rise to a *post hoc ergo proper hoc* kind of thinking by trial courts in deciding custody questions. Where it is shown that a custodial parent is engaging in conduct of questionable morality, and where it is shown that the child is not doing well, there is a danger that a trial court may grant a change of custody without direct evidence of a cause and effect relationship between the two phenomena. Under this standard the effect having been proved, the cause may be inferred. But this is far more acceptable than the other standards where the effect is presumed.

We note one other difficulty with the Ohio standard which requires that a direct adverse impact be shown. This means that a court may not act to change custody until the harm has, or probably has been done. But this difficulty must be considered in light of the harm to the child that necessarily follows a change of custody. R. C. 3109.04 (B) (3) states:

"The child's present environment endangers significantly his physical health or his mental, moral, or emotional development and the harm likely to be caused by a change of environment is outweighed by the advantages of such change to the child."

The statute requires courts to hold that any change of custody is likely to harm a child, but that the present dangers to the child outweigh that harm. As with most issues of custody, it's a Hobson's choice, and the trial courts must make hard decisions, choosing the least harmful alternative. But while this standard does have difficulty in its theoretical application to custody questions, it is the best standard because as a practical matter it directs the court's attention

to an area of its primary concern—the best interests of the child.

Professor Lauerman sums up what we believe is the law in Ohio.

"In sum, the direct adverse impact approach to custody cases involving parental nonmarital sexual conduct is the soundest, provided certain limitations on its application are adopted. Courts should consider only present impact. Before depriving the sexually active parent of custody, courts should demand preponderance proof that the parent's conduct is having or is probably having an effect on the child and that the effect is actually harmful. Without such proof, the fact of nonmarital sexual conduct should not justify a custody denial or change. Moreover, on the issue of harmfulness, the primary focus should be on the child's present physical and psychological welfare and developmental potential. Unless accompanied by clearly adverse collateral consequences, moral impact should be ignored." (Page 681.)

In *Beamer* v. *Beamer, supra,* custody was changed, not because of the "immoral" conduct of the custodial parent, but because of the effect of that conduct on the children in question. In a similar case in the Court of Common Pleas in this district, (where the custodial parent bore a child out of wedlock), *McDaniel* v. *McDaniel* (1967), 16 Ohio Misc. 32, affirmed, Fourth Appellate District, Highland County No. 182, the court considered the impact of such conduct on the children, not the conduct itself. We believe this was the proper position for this court to take in that case, and we apply the same standard in the case *sub judice.*

An appellate court may not substitute its judgment for that of the trial court. *Trickey* v. *Trickey* (1958), 158 Ohio St. 9.

"Where there is a conflict in the evidence which would permit reasonable minds to reach different conclusions upon issues of fact, the decision of the trier of fact must be affirmed." *Swanson* v. *Swanson* (1976), 48 Ohio App. 2d 85, paragraph 1 of the syllabus.

In this case there is no conflict in the evidence. Appellee admits that appellant is a good mother. The issue presented is a question of law: the power of a court to change custody to punish a parent whom the court believes has behaved im-

morally. Though we are loathe to reverse a trial court in a custody case because of that court's better knowledge of the entire case, we would be remiss in our duty if we did not act to prevent a misapplication of the law of Ohio.

Based on the foregoing, the judgment of the trial court is reversed.

*Judgment reversed.*

ABELE, P. J., concurs.

STEPHENSON, J., concurs in the judgment only.