KRAUS, APPELLANT, *v.* KRAUS, APPELLEE.

64

(No. 46238—Decided June 7, 1983.)

*Mr. Thomas N. Gartman,* for appellant.

*Mr. George Glavinos, Jr.,* for appellee.

JACKSON, J. This is an appeal from a decision of the Domestic Relations Division of the Cuyahoga County Court of Common Pleas, modifying provisions of the original divorce decree regarding child custody, alimony, child support, and possession of the marital home.

The parties were divorced December 19, 1980, upon a finding that the appellee Chester Kraus was guilty of gross neglect of duty.

Custody of the children, Joseph and Michael, was granted to appellant Barbara Kraus. Possession of the marital home was granted to "whomever [*sic*] has custody of the children * * *." The home was to be sold, and the proceeds equally divided, when the youngest child reached eighteen years of age. Appellee was ordered to pay $40 per week per child as child support. He was also ordered to pay the entire mortgage on the home (the sum of $323 per month), one-half of which was to be considered as alimony.

On January 29, 1982, appellee filed a motion to modify the divorce decree on the ground that the appellant was cohabiting with another man in the marital home. He requested custody of the children or that the court relieve him of the obligation to pay the mortgage on the marital home.

Following a trial before a referee, the trial court entered an order granting appellee custody of the children and possession of the marital premises. He was ordered to continue paying the mortgage on the home. Barbara Kraus has appealed this order to this court of appeals,[1] contending that the trial court failed to correctly apply relevant provisions of statutory law.[2]

At the time of trial Joseph was fifteen and Michael was eleven. By the time the

---

[1] Appellant's assignments of error are as follows:

"I. The court erred when it ignored the clear elections of the children made pursuant to O.R.C. § 3109.04(A) where the record was devoid of clear and convincing evidence demonstrating that the mother was 'unfit to take charge' or maintain custody and there was no finding by the court that it would not be in the best interest of the children to have the choice.

"II. The court erred when it inferred, despite the statutory presumption of parental fitness and despite a lack of clear and convincing evidence to rebut this presumption, that the mother was a parent 'unfit to take charge.'

"III. The court erred when it ignored and/or failed to consider the five relevant factors mandated to be considered when applying the 'best interest' test as set forth in O.R.C. § 3109.04(C).

"IV. The court erred when it inferred 'adverse impact' as the result of the mother's sexual activity and/or 'significant endangerment' when neither 'adverse impact' nor 'significant endangerment' had been demonstrated on the court's record."

[2] Appellee did not appear before this court to respond to arguments by appellant on the merits.

order on the motion was entered changing custody over them from their mother to their father, Michael had turned twelve. Both expressed a desire to continue living with their mother.

Provisions of R.C. 3109.04 govern the original award and any modification of the award of custody of minor children.[3] These provisions clearly indicate a presumption which favors retaining the current custodian. This is especially strong in cases where the children are older than twelve and choose to remain with the current custodian.[4] Pursuant to R.C. 3109.04, before custody can be changed by court order, the court must find that:

(a) The custodial parent is unfit *or* that it is not in the best interest of the child to let him or her choose which parent to live with; and

(b) That a change has occurred in the circumstances of the child or the custodial parent; and

(c) Because of this change in circumstances, a change in custody is necessary to serve the best interest of the child; and

(d) The child's present environment significantly endangers his or her physical, mental, emotional or moral development; and

(e) The advantages of a change in custody outweigh the harm likely to be caused.

The following is a summary of the

---

[3] The following are relevant provisions of R.C. 3109.04:

"(A) * * * The court may allow any child who is twelve years of age or older to choose, in an original proceeding on custody and in a proceeding for modification of a prior custody order of the court, the parent with whom the child is to live, unless the court finds that the parent so selected is unfit to take charge or unless the court finds, with respect to a child who is twelve years of age or older, that it would not be in the best interest of the child to have the choice. * * *

"* * *

"(B)(1) Except as provided in division (B)(2) of this section, the court shall not modify a prior custody decree unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his custodian, or either joint custodian, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the custodian or both of the joint custodians designated by the prior decree, unless one of the following applies:

"(a) The custodian or both joint custodians agree to a change in custody.

"(b) The child, with the consent of the custodian or of both joint custodians, has been integrated into the family of the person seeking custody.

"(c) The child's present environment endangers significantly his physical health or his mental, moral, or emotional development and the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

"* * *

"(C) In determining the best interest of a child pursuant to this section, whether on an original award of custody or modification of custody, the court shall consider all relevant factors, including:

"(1) The wishes of the child's parents regarding his custody;

"(2) The wishes of the child regarding his custody if he is eleven years of age or older;

"(3) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;

"(4) The child's adjustment to his home, school, and community;

"(5) The mental and physical health of all persons involved in the situation."

[4] This presumption has become a cornerstone of public policy regarding child custody questions, due in large measure to the influence of the book, Beyond the Best Interests of the Child, by Goldstein, Freud, and Solnit (The Free Press 1973, 1979). The authors emphasized the importance of continuity of parental figures for children's normal development.

evidence adduced by the parties to determine the issue before the trial court, *i.e.,* whether there had been a significant change in circumstances, and whether the present environment significantly endangered the physical health as well as the mental, moral and emotional development of the children.

The first witness was Ernest Hubbard, next-door neighbor to the Krauses. Hubbard testified that the Kraus' stereo was sometimes played loudly at night. On direct examination, he stated that the stereo was played as late as 10:00 or 11:00 p.m., but on cross-examination he stated it was 9:00 or 10:00 p.m. Hubbard's wife told him she saw eight children "running all over" the house, but he could not remember what month or year this occurred. He recently saw ten children playing football at the Kraus home, who were trampling on his property. He stated that this bothered his wife and her mother, but not him.

Joseph Kraus, the fifteen year old son of the parties, testified that his mother's friend, Ron Sheetz, came to live with them in the summer or early fall of 1981. When asked to describe his activities with Sheetz, he stated that they talked a lot, watched television, sometimes visited friends of Ron, and sometimes went out to dinner.

Joseph stated that his grades had declined "a little bit" from last year perhaps because he had changed subjects or did not understand the material. He does his homework between 5:00 and 6:30 p.m. He testified that he works on his own, but asks his mother or Ron for help if he is stymied. He also said that he studies more than he did the previous year. He arrives home from school at 3:40 or 3:50 p.m. every day. His mother, the appellant, arrives home from work at 9:30 p.m. on Monday, Thursday, and Friday, and at 11:00 p.m. on Tuesday nights when she bowls. When his mother works late he has friends over or visits their homes. His mother sometimes asks him to watch his little brother Michael. His brother often has friends over. There is no babysitter.

Joseph sometimes cooks dinner for himself and his brother, and sometimes starts dinner when his mother calls him before leaving work. They eat at about 9:50 p.m. He goes to bed at 11:00 p.m.

His brother Michael does homework between 6:00 and 7:00 p.m. He usually goes to bed at about 10:00 p.m., but sometimes stays up to watch television.

Joseph stated that when his mother was home in the evenings, she would cook dinner and they would eat at 6:00 or 7:00 p.m.; they would go to bed between 9:00 and 9:30 p.m.

Joseph stated that their father participates with them in sports more now than before. Their father is dependable in visitation. On Tuesday evenings and Saturday afternoons they go bowling, go to the movies, or go to their grandmother's house. Joseph enjoys his father's company. When their father was home, they went to church, which they no longer do.

Joseph testified that he would rather live with his mother, because she would take better care of him and Michael. He said that his mother would be there before they went to school, but that their father would leave for work before they got up.

Michael Kraus, who was eleven years old at the time of the hearing, corroborated his brother's testimony about their mother's schedule, adding that she arrives home from work on Wednesday evenings at 7:00 or 7:30 p.m. He stated that appellant prepares dinner when she arrives home, and that they eat at about 10:30 p.m., and he goes to bed about 11:00 p.m.

When he arrives home from school, Michael watches cartoons until 5:30 p.m., and then plays outside. When he comes in, he does his homework, and watches more television. He does not play with his brother, except for video games.

Michael testified that he has moved up in reading level from "5-1" to "M."

His grades in health, language, and spelling have declined. He said that he usually does his homework at school before coming home.

Michael stated that he loves his father and would like to have his father at home, but when asked to choose, he said he would rather live with his mother. He said he gets along well with his father and mother, and "very much" with "Ron." He said he was a "little bit" jealous of "Ron" when he moved in, because his mother paid more attention to "Ron." Michael stated that he was no longer jealous because his mother was more equal in her attention. He would rather have Ron in the home than live with his mother alone, because she used to cry at night from being alone.

His father calls him three or four times per week. He helps him with his homework "a little bit." On Saturday, they usually go to McDonald's, go bowling, and go to their grandmother's house. On Tuesday, his father arrives about 6:00 p.m. Michael stated that he is alone on Tuesday evenings if his father has to leave early to go someplace.

On Sunday, Michael said, his friends are usually at church. His mother sometimes cooks a Sunday dinner, if they are not full from Saturday.

The appellee testified that he filed the motion for change of custody essentially because of Sheetz's presence in the home and because of the lack of supervision in the evenings for the children. He said he would be home in the evenings to make his sons do their homework and to love them.

Appellee described several problems he had observed during his wife's custody of the boys. He said there are numerous children around when he comes over. The boys' grades have declined since he moved out. On one occasion, Joseph was allegedly arrested at 2:00 a.m. with some other boys who were siphoning gas from another person's automobile, when he was supposed to have been spending the night with a friend. There is no police or juvenile record of such incident. On two occasions, once in November and once in February, his former wife was not at home on Saturday evening when he came to return the boys, and he took them home to stay with him. On the first occasion, her furnace was broken, and she did not even call to find out where the children were.

Appellee testified that he leaves for work at 7:00 a.m., and returns home at 5:00 p.m. He does not work on the weekends. He earns $22,000 annually.

Appellee alleges that on one occasion, he planned to go to King's Island for a week with his boys and his girlfriend. The boys objected to this, telling him they wanted to spend time with him alone. He cancelled the vacation to King's Island, and did something else with them that week.

When he asked the boys how they would feel if custody changed, they both told him that they could not take the change.

Appellant testified that she was employed at the Strongsville schools, twenty hours per week, earning $2.90 per hour in 1980, when the divorce became final. She was required to take another job to support herself and the children. She stated that the same referee before whom this matter for change of custody was being heard had advised her, during the divorce proceedings, that it would be necessary for her to find a better job. She obtained employment at a store, thirty-four hours per week, earning $5 per hour. Sheetz contributes about $200 per month to the household.

Appellant stated that before she permitted Sheetz to move in with them, she discussed it with her children to see if they would object. They did not object then, and still do not. She explained that both she and Sheetz were recently divorced, and did not want to remarry until they are certain that the relationship would last. Sheetz was allowed to move in

only after they gave the matter "a great deal of consideration."

She stated that she works five minutes from home. Sometimes the boys visit her at work. She has not tried to get another job. She works for the same employer as Sheetz, but not at the same store.

In the morning she wakes both boys up. Joseph walks to school, and Michael is driven. She stated that for fourteen years she stayed home with her children, but that things had changed.

Appellant indicated that her former husband's interest in the children was greater than it had been. Previously, he would take the children for only about two hours on Saturdays. This year, he came around more often than just on Tuesdays and Saturdays, and also played ball with them.

Regarding the occasion referred to by appellee, on which the furnace was out on a Saturday in November, appellant explained that she returned home at 11:00 p.m., and that Sheetz repaired the furnace by 11:15 p.m.

The school reports incorporated into the court investigator's report indicate that, though Michael's grades are "fair," he is working up to capacity. Joseph's grades are "fair to poor," D+, even though his IQ is listed at 120-128. In eighth grade, he earned grades of C+ to C−, while in sixth grade he had excellent grades until the fourth quarter. It appears that the downturn in his grades occurred at the end of the 1978-1979 school year, before the parties separated. Both children are described in the report as being "friendly" with other students and "very cooperative" with their teachers.

At the time of trial Joseph was fifteen and Michael was eleven years of age. At the time the final order by the trial court was entered changing custody of the children from their mother to their father, Michael had reached the age of twelve. Both expressed an unequivocal desire to continue living with their mother.

On September 29, 1982, upon completion of the hearing on defendant-appellee's motion for change of custody and to modify judgment entry of divorce, the referee issued a report containing the following conclusions and recommendations:

"[T]he conduct of the mother and the absentee supervision of the minor children constitutes [sic] neglect, and it is not in the best interest of the minor children that she continue to have custody of the minor children under the present circumstances, and that the Referee concludes and recommends that the custody of the minor children be changed, and that concurrently with the Defendant having custody of the minor children that he have possession of the jointly owned residence as provided for in the stipulation of the parties on October 15, 1980, further that the provision for him to pay the full mortgage payment, one-half considered to be alimony, should be terminated, and that the Plaintiff be required to pay her one-half of the mortgage.

"The Referee finds that the children's present environment endangers significantly their physical health as well as their mental, moral and emotional development and the harm likely to be caused by a change of environment is outweighed by the advantages of such change to the children. (3109.04 ORC)."

The trial court's order on November 19, 1982 approved the report and recommendations of the referee, except that it declined to order appellant to pay any part of the mortgage payment on the home, leaving the appellee entirely responsible for this obligation. However, neither the findings of the referee nor the entry of the trial court found the appellant to be an "unfit mother."

The record discloses that it was appellee's gross neglect of the family that led to the divorce, the subsequent necessity for appellant to seek full-time employment, and ultimately precipitated the mo-

tion for change of custody by appellee husband.

The hearing which resulted in the divorce granted to appellant was conducted by the same referee who heard the change of custody motion. This referee in October 1980, had recommended a divorce and custody of the parties' two children by appellant wife because "* * * defendant (husband) put his softball games, bowling and card games before the family *for the past fourteen (14) years,* frequently being absent from the home, and further that defendant moved out of the marital residence on October 2, 1979. * * *" (Emphasis added.)

The record further discloses that in the divorce proceeding two years earlier, this referee found that "* * * because of the ages of the children, and lack of marketable skills at the present time, plaintiff has found it inappropriate to seek full-time employment outside of the home. * * * That the plaintiff presently works, part-time, in the cafeteria of the school where the children are in attendance, with a maximum rate of two dollars and ninety cents ($2.90) per hour during the school year, permitting plaintiff to be at home with the children when they are not in school, and further that her projected earnings are approximately one thousand nine hundred ninety dollars ($1,990.00) per year."

The record further discloses unrefuted testimony by appellant wife that this referee advised her during the divorce proceeding that it would be necessary for her "to find a better job."

There are two Ohio cases which bear upon the issue of child custody. In *Beamer* v. *Beamer* (1969), 17 Ohio App. 2d 89 [46 O.O.2d 118], the Seneca County Court of Appeals affirmed an order changing custody from the mother to the father, on the ground that the mother "took the children to live in a trailer where she lived with a man, married to another, and bore him a child." *Id.* at 100. However, the sole criterion considered by the court of ap-

peals was "the best interest of the child." *Id.* There was no consideration of the factors now set forth in R.C. 3109.04, including the wishes of the children, whether their development was significantly endangered, and whether the advantages that might occur upon removing them from their mother would outweigh the harm likely to occur.

The other relevant case is *Whaley* v. *Whaley* (1978), 61 Ohio App. 2d 111 [15 O.O.3d 136]. Therein the Lawrence County Court of Appeals reversed an order changing custody from mother to father. The trial court in that case awarded custody to the father because the mother was sexually involved with a married man, and had gone on a vacation with him and her child. The court of appeals, in a thorough and well-reasoned opinion, described the pitfalls of determining child custody on the basis of one's perceptions of the "morality" of a spouse. The court stated:

"If immoral conduct is presumed to be harmful, the party seeking a change of custody need not show a change of circumstances which is harmful to the child — that is presumed. The burden of proof on that party is to show 'immorality,' and impliedly to prove a moral norm which the custodial party has violated. Disregarding the momentous constitutional implications of such a standard, and in light of the diversity of religious and moral practice in this country we find it simply an unworkable standard beyond the realm of legitimate [*sic*] judicial inquiry." *Id.* at 117.

The court held "that immoral conduct must be shown to have a direct or probable adverse impact on the welfare of the child in order to justify a change of custody, we believe to be the rule in Ohio." *Id.* at 118.

The court of appeals noted that a divorce decree is a final judgment conclusive and binding on the parties, and that this was especially important in child custody proceedings:

"The principle of finality is particularly necessary in custody cases because of the special needs of a child. A child needs a continuing relationship with the person who cares for him, and any time that continuity is broken the child suffers. This is so well known as to be almost beyond contradiction. It is a matter of common knowledge to any parent, grandparent, or foster parent and has been documented by many studies. *The Writings of Anna Freud,* New York International University Press, 1973: See volume 3 wherein the problems of children separated from their parents during World War II are discussed, or volume 7, page 247, wherein the circumstances which gave rise to *Painter* v. *Bannister* (1966), 258 Iowa 1390, 140 N.W. 2d 152, *certiorari denied,* 385 U.S. 949, are discussed with particularity. Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, (the Free Press 1973). Courts must be aware that any change of custody will have some, perhaps grave, consequences for the child." *Id.* at 112-113.

The facts in the case at bar present a more difficult decision than in the *Whaley* case, because the mother's boyfriend lives in the marital home and undeniably has a direct impact on the children. However, this court is persuaded that the evidence adduced failed to demonstrate that Sheetz' presence had an adverse impact on the children. Neither can a change of custody be predicated upon the children's low grades in school, for these have apparently existed since before the parties' divorce. Other isolated incidents are not sufficient to indicate a pattern of neglect necessitating a change in custody.

A troublesome aspect of appellant's behavior is her failure to seek another job, which would allow her to be home when her children return from school and during the evening hours. This court can take judicial notice, however, of the referee's finding of appellant's lack of marketable skills, fourteen years as a virtually full-time housewife, and the devastatingly high unemployment which has adversely affected opportunities for employment in this city for several years.

It is also imperative that this court, in resolving the issues of this appeal, consider the impact of the parties' divorce, occasioned by the appellee's fourteen years of neglectful conduct, in creating the family circumstances which are the subject of concern herein. It was necessary for appellant to work full-time to support herself and family, even though the particular circumstances involved are not necessarily desirable. This cannot be considered "neglect" on the part of appellant as found by the referee.

The evidence presents a picture of two persons who are attempting to fulfill their responsibilities as parents, but who do not have time to spend with their children because of the breakdown of their marriage. Appellant is unable to spend evenings with the boys. Appellee cannot be there in the mornings.

There was a less drastic remedy available to the trial court to resolve this case. Custody could have remained in the mother (who appears to be the main source of nurturing for the children), but visitation granted to the father every weekday, afternoon and evening, so that the children would be supervised during that period, with appropriate orders to ensure that the mother and her friend not interfere with such visitation by their presence. The appellee could have been at least partially relieved of the obligation of paying the mortgage on the premises, so long as appellant insisted on living there with a man in a *de facto* state of marriage. See *Wolfe* v. *Wolfe* (1976), 46 Ohio St. 2d 399 [75 O.O.2d 474].

The evidence, however, is clearly not sufficient to support a change in custody from appellant to appellee because the evidence adduced does not demonstrate that the physical health or mental, moral, or emotional development of the parties' children was "significantly endangered"

by their life with their mother, as required by R.C. 3109.04.

In the language of Judge Grey in *Whaley* v. *Whaley, supra,* at 119-120, this court is persuaded that "[t]he issue presented is a question of law: the power of the court to change custody to punish a parent whom the court believes has behaved immorally. Though we are loath to reverse a trial court in a custody case because of that court's better knowledge of the entire case, we would be remiss in our duty if we did not act to prevent a misapplication of the law of Ohio."

Accordingly, the judgment of the trial court is reversed and judgment is entered for the appellant. Appellee is ordered to return the possession of the marital property and custody of the two minor children, Joseph and Michael, on or before June 17, 1983,[5] and all previous orders of the trial court relating to the parties prior to the judgment entry of the trial court dated September 29, 1982 are reinstated and in full force and effect.

*Judgment reversed.*

DAY, P.J., and ANN MCMANAMON, J., concur.

---

[5] The recommendations of the referee, as approved by the final entry of the trial court, ordered appellant wife to "turn over possession of the children, and possession of the jointly owned premises on or before 10/30/82 * * *." On January 25, 1983, another panel of this court overruled a motion by appellant for a stay of execution pending appeal, and counsel for appellant, during oral arguments to this court, stated that appellant had complied with the order of the trial court. Accordingly, this panel has no choice given the merits of the case, but to order an immediate return to the *status quo ante* even though we recognize that this action will constitute a double shift and that:

"On appeal pending review of the final decision a child ought not to be shifted back and forth between competing claimants merely to accord with what may prove to be tentative decisions." Beyond the Best Interests of the Child, *supra,* at 38-39.