CONKEL, APPELLEE, *v.* CONKEL, n.k.a. BROWN, APPELLANT.

(No. 85 CA 38—Decided February 24, 1987.)

---

170

*Robert D. Huffer,* for appellee.
*James R. Kingsley,* for appellant.

GREY, J. This is an appeal from the judgment of the Pickaway County Court of Common Pleas granting appellee overnight visitation with his children. We affirm.

The record reveals the following facts. Charles L. and Kim D. Conkel were married on October 14, 1972. Two children, both boys, one age ten, and the other age seven, were born as issue of the marriage. On July 2, 1981, the parties obtained a decree of dissolution which incorporated a separation agreement between the parties.

The separation agreement provided for reasonable visitation for the father, Charles L. Conkel. In October 1984, the court, acting on the motion of Kim D. Conkel (now Brown), set specific visitation for Conkel. In August 1985, Brown filed a motion to cite Conkel in contempt for his failure to pay child support, to increase child support, and to establish a garnishment procedure against his wages. Conkel, in turn, filed a motion to cite Brown in contempt for denying visitation and to enlarge his visitation time with his children. On September 3, 1985, the court held a hearing on the respective motions. On September 10, 1985, the parties filed a stipulation which stated in part that Conkel was bisexual, living with a male friend, and occasionally engaged in sexual acts with this friend. It was further stipulated that Conkel had never made any sexual advances toward his sons. In the court's judgment entry on the motions, Conkel was granted overnight visitation with his children but on the condition that Conkel was not to exercise his visitation in the presence of any non-related male person.

Brown appeals the trial court's order of overnight visitation and assigns one error:

"It was prejudicial error for the trial court to allow appellee, a practicing homosexual, overnight visitation with his minor children."

Appellant Brown grounds her contention on five statements: (1) she is fearful for the physical and mental well-being of the children because visitation with their father may trigger homosexual tendencies in them; (2) during visitation with their father they may contract AIDS; (3) homosexuality is a basis to change custody; (4) an extended visitation would force the children to "confront the homosexual problem" and "suffer the slings and arrows of a disapproving society"; (5) an adverse impact need not be shown.

None of these statements squarely presents the legal question facing this court. Before addressing the statements one by one, the court will structure the context of this dispute under the laws of the state of Ohio.

Under R.C. 3109.05, the court may make a visitation order which is "just and reasonable." The standard for such an order is the best interests of the child. *Miller* v. *Miller* (1966), 7 Ohio App. 2d 22, 36 O.O. 2d 69, 218 N.E. 2d 630. *State, ex rel. Scordato,* v. *George* (1981), 65 Ohio St. 2d 128, 19 O.O. 3d 318, 419 N.E. 2d 4.

The purpose of visitation orders is to promote the children's continuing contact with the non-custodial parent. The need for visitation is recognized in Ohio. The Ohio Supreme Court made the importance of visitation clear in *Porter* v. *Porter* (1971), 25 Ohio St. 2d 123, 54 O.O. 2d 260, 267 N.E. 2d 299, paragraph three of the syllabus:

"The need of a child for visitation with a separated parent is a natural right of the child, and is as worthy of protection as is the parent's rights of visitation with the child; thus, the failure, without just cause, of a divorced or separated parent having custody of a child to accord visitation rights to the

other parent is not only an infringement of the other parent's right to visitation but is also an infringement of the child's right to receive the love, affection, training and companionship of the parent." See, also, *Pettry* v. *Pettry* (1984), 20 Ohio App. 3d 350, 20 OBR 454, 486 N.E. 2d 213.

The bond between parent and child has been accorded constitutional protection. In 1972, the Supreme Court in *Stanley* v. *Illinois* (1972), 405 U.S. 645, 651, recognized that the interest of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection. * * *". In *Stanley*, the court set aside a presumption that a father was unfit based solely on his status as an unwed father. Recently, the Supreme Court limited the *Stanley* protection to fathers who had had a prior relationship to their children. *Lehr* v. *Robertson* (1983), 463 U.S. 248. However, at the same time, the court re-emphasized that the parental "interest in personal contact with * * * [the] child acquires substantial protection under the Due Process Clause." *Id.* at 261.

Brown's contentions constitute an unconstitutional "status" argument, *i.e.,* that the appellee father's status as a homosexual man establishes conclusive proof of a judicial abuse of discretion. This court rejects such an argument. See *Robinson* v. *California* (1962), 370 U.S. 660. Secondly, Brown's contentions posit an irrebuttable presumption of unfitness based on sexual activity. This court has already rejected that argument in *Whaley* v. *Whaley* (1978), 61 Ohio App. 2d 111, 15 O.O. 3d 136, 399 N.E. 2d 1270. Such an irrebuttable presumption offends the constitutional standards of *Stanley* and *Lehr, supra.* In *Whaley, supra,* this court held that the issue of immoral conduct is relevant only to the extent that it affects the child. Such conduct can be considered in the grant of custody or modification of a custody order only if the conduct of the

parent has a direct adverse impact on a child.

Ohio courts have followed *Whaley, supra,* but only in cases involving divorced heterosexual parents. Other jurisdictions have considered homosexual parents. In *A.* v. *A.* (1973), 15 Ore. App. 353, 358, 514 P. 2d 358, 360, the Oregon Court of Appeals held that the homosexuality of a parent should not result in a determination of unfitness *per se.* See, also, *Nadler* v. *Superior Court* (1967), 255 Cal. App. 2d 523, 63 Cal. Rptr. 352. In a well-written article, Rivera, The Legal Position of Homosexual Persons in the United States (1979), 30 Hastings L.J. 799, the status of a homosexual or lesbian parent attempting to assert custody or visitation rights is discussed in depth. The article points out that courts are beginning to apply an objective standard of the best interests of the child rather than looking to the sexual habits of the parent. *Id.* at 903-904. As this court stated in *Whaley, supra,* "[a] child must not be used to punish or reward conduct a particular judge might condemn or condone." *Id.* at 114, 15 O.O. 3d at 138, 399 N.E. 2d at 1273.

Too long have courts labored under the notion that divorced parents must somehow be perfect in every respect. The law should recognize that parents, married or not, are individual human beings each with his or her own particular virtues and vices. The children of married parents are expected to take their parents as they find them — as Oliver Cromwell said to his portraitist, "with warts and all." Whatever their faults, unless the married parent's conduct is harming the child, the courts will not intervene in the parent-child relationship.

In divorce cases, however, the court has no choice but to intervene to establish custody and visitation. Nonetheless, the same standard should be used. In domestic relations cases the courts should recognize that all parents have faults, and look not to the faults of the

parents, but to the needs of the child. A child needs to know that both his parents, divorced or not, love him. Where the parent is removed from the child's environment, the child feels a sense of loss (see the discussion in *Whaley, supra,* regardless of the parent's faults and whatever the reason for the separation). If the courts are concerned with the best interests of the child, then visitation by the non-custodial parent must be recognized as necessary to the child's well-being. The denial of visitation should only be done when egregious conduct by the non-custodial parent results in harm to the child.

Brown relies on *Roberts* v. *Roberts* (1985), 22 Ohio App. 3d 127, 22 OBR 328, 489 N.E. 2d 1067, where the Tenth District Court of Appeals reversed the granting of visitation privileges to a homosexual father. In its very narrow ruling the court held that the *only* evidence before the court was that the minor children would be harmed by such visitation. At the hearing before the referee in *Roberts,* the mother presented expert testimony from psychologists as to the detrimental effect on the children of visitation with their father. This evidence was unrebutted. In reversing, the *Roberts* court considered not the issue of homosexuality, but the issue of effect on the children. In remanding, the *Roberts* court directed the trial court to grant visitation if the adverse effect on the children could be eliminated.

The *Roberts* decision is a very narrow one and entirely different from the facts here. The record in this case presents no evidence that overnight visitation would be harmful to the Conkel boys, or that the boys would be psychologically or physically harmed.

We now turn to the specific contentions of appellant Brown. For the sake of logical construction, we will first address the contention that direct adverse impact on the child need not be shown.

Brown wishes to distinguish this case from *Whaley.* In *Whaley,* we held that to change custody the movant must first show a change of circumstances before the best interests of the child can be considered. Brown argues that since this is a case dealing with modification of visitation, no showing of a change of circumstances is necessary, and the *Whaley* case is inapplicable. While not exactly on point, the *Whaley* decision does guide the court in determining issues raised by the parties. When reduced to essentials, the substance of this case and of the *Whaley* case is similar: the non-marital sexual conduct of one parent offends the other parent. However, whether the issue is custody or visitation, before depriving the sexually active parent of his crucial and fundamental right of contact with his child, a court must find that the parent's conduct is having, or is probably having, a harmful effect on the child. In this case there is no evidence of any harmful effect.

Brown expresses "fear" that contact with their father will trigger homosexual tendencies in the two boys. No evidence was presented to support this contention. This court takes judicial notice that there is no consensus on what causes homosexuality, but there is substantial consensus among experts that being raised by a homosexual parent does not increase the likelihood that a child will become homosexual.

Dr. Richard Green, Professor of Psychiatry, State University of New York at Stony Brook, an expert on gender identity in children, has said that "* * * [n]o theory in the developmental psychology literature suggests that having homosexual parents leads to a homosexual outcome. Rather, heterosexual parents raise pre-homosexual children." The Best Interests of the Child with a Lesbian Mother (1982), 10 Bulletin of the American Academy of Psychiatry and the Law 7, at 9.

The appellant mother also indicates being "petrified" that the children will contract AIDS. Certainly, an incurable terminal illness is a frightening prospect. However, no evidence was presented that the father in this case is seropositive with HIV or has AIDS or ARC. AIDS or other HIV-associated diseases are not contracted by casual household contract. See Friedland, Saltzman, Rogers, et al., Lack of Transmission of HTLV-III/LAV Infection to Household Contacts of Patients with AIDS or AIDS-Related Complex with Oral Candidiasis (Feb. 6, 1986), New England J. Med., Vol. 314, Issue No. 6, 344. See, also, Sande, Transmission of Aids, the Case Against Casual Contagion (Feb. 6, 1986), New England J. Med., Vol. 314, Issue No. 6, 380.

Finally, the appellant mother argues that increased visitation will subject the children to the "slings and arrows of a disapproving society." This court fails to see why the extension of visitation would exacerbate this issue. The children will have to come to terms with the fact that their father is homosexual. In a similar case in New Jersey, *M.P.* v. *S.P.* (1979), 169 N.J. Super. 425, 404 A. 2d 1256, a New Jersey appellate court noted that changing custody would not remove the source of stigma and potential embarrassment. The New Jersey court left the children with their homosexual parent and postulated a beneficial effect for the children, *i.e.,* overcoming "the constraints of currently popular sentiment or prejudice." *Id.* at 438, 404 A.2d at 1263.

This court cannot take into consideration the unpopularity of homosexuals in society when its duty is to facilitate and guard a fundamental parent-child relationship. The Supreme Court of the United States faced the question of popular disapproval in 1984 in the case of *Palmore* v. *Sidoti* (1984), 466 U.S. 429. In *Palmore,* the trial court removed a white child from her natural mother because the white mother was cohabiting with a black man, whom she later married. The white father relied on the issue of social stigma. The Supreme Court recognized that such a child might "be subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin." Nonetheless, Chief Justice Burger, in overruling the trial court, wrote, "* * * The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. * * *" *Id.* The Supreme Court of Alaska in May 1985 applied the *Palmore* case to a lesbian mother custody case, *S.N.E.* v. *R.L.B.* (Alaska 1985), 699 P. 2d 875. The court held: "[I]t is impermissible to rely on any real or imagined social stigma attaching to [the] Mother's status as a lesbian. * * *" *Id.* at 879.

In this case, the trial court was bound by R.C. 3109.04 to arrive at a just and reasonable order. No evidence was presented nor arguments made which support the proposition that the trial judge abused his discretion by permitting overnight visitation.

While this court recognizes that the mother's concerns are genuine, we find that the trial court did not err by granting overnight visitation privileges to the father. We, as a reviewing court, must base our decision on the record before us. There was no evidence presented below that would permit this court to do anything but affirm the trial court's decision. The trial court acted in the best interests of the children. Appellant mother's assignment of error is without merit and is overruled.

*Judgment affirmed.*

STEPHENSON, P.J., concurs.

ABELE, J., dissents.