Because I disagree with the majority's analysis, I respectfully dissent.
 Standard of Review
Although the name change statute vests discretion with the trial court to determine whether to grant a name change application, this discretion is not unlimited. The name change statute uses the permissive verb "may," but this does not mean that this court is prohibited from reversing the trial court's denial of appellants' name change applications. The supreme court has reversed and remanded a trial court's decision to deny a name change that was not adequately supported by law. In re Willhite (1999),85 Ohio St.3d 28, 31-33. When deciding whether to grant a name change, the trial court must determine whether there is "proof that * * * the facts set forth in the application show reasonable and proper cause for changing the name of the applicant." Id. at 30, quoting R.C. 2717.01(A).
 The Analysis of the Trial Court and the Majority Opinion
Both the trial court and majority's analyses of whether appellants' requested name changes were reasonable and proper rest upon their assertion of a particular public policy. I believe that there must be clearer guidelines for the court to determine the interaction of public policy with name change. This responsibility is first for the legislature and ultimately for the supreme court. Today the religious influence and tradition that marriage and family unit are synonymous has been legislatively and judicially eroded.
The trial court gave the following legal reasoning in support of its decision to deny appellants' name changes:
 It is not reasonable and proper to change the surnames of cohabiting couples, because to do so would be to give an aura of propriety and official sanction to their cohabitation and would undermine the public policy of this state which promotes legal marriages and withholds official sanction from non-marital cohabitation.
In affirmation of the trial court's decision, the majority writes:
 We find that there is support for the trial court's determination that Ohio law favors solemnized marriages and that cohabitation contravenes this policy. Accordingly, the trial court did not abuse its discretion by finding that court sanctioning of the use of the same surname by two unmarried cohabitants is against Ohio's public policy promoting marriage.
The majority's opinion seems to say that the trial court was right to deny the requested name changes because appellants were cohabiting, and cohabitation of unmarried couples is against the public policy of this state to promote solemnized marriage. This analysis is not reasonable and proper for three reasons. First, it relies upon the unsupported premise that cohabitation of unmarried partners contravenes current public policy. Second, it relies upon the unsupported premise that by refusing appellants' requests, the court is protecting the sanctity of marriage. Third, the decision fails to honestly address the real legal question before us, which is whether appellants, who are same-sex partners, may be denied their name change requests.
 Cohabitation of Unmarried Couples Does Not Contravene the Current Public Policy of this State
The majority argues that cohabitation of unmarried couples contravenes the current public policy of this state. In support of their argument, the majority points out that in 1991, the Ohio legislature abolished any new recognition of common law marriages. Although the legislature decided to end the legal recognition of common law marriage, this measure was probably not intended to be a "condemnation" of the practice of cohabitation between adults in romantic relationships. The majority opinion offers no legislative history to support its contention that the abolition of common law marriages was a result of a legislative public policy of promoting solemnized marriages and disfavoring the cohabitation of unmarried couples. I believe that the abolition of common law marriages was likely the result of years of problems in the courts in proving marital status for the assertion marital rights.
One example of such proof problems in the probate courts was showing that your partner, now deceased, lived with you in such a way that you were his or her spouse according to common law was a tough task and led to uncertainty in the courts. In fact, the leading case cited by the majority support my point. In re Estate of Redman (1939), 135 Ohio St. 554, in which the supreme court commented that "common-law marriages contravene public policy," involved the inheritance rights of a man who claimed to be the common law spouse of a woman who died intestate with no known heirs.
An example of proof problems in criminal court is illustrated by Statev. Depew (June 29, 1987), Butler App. No. CA85-07-075, unreported, a case also cited by the majority as an example of judicial disapproval of common law marriage. In that case, Depew argued that a woman was his common law wife and therefore was precluded from testifying against him at his trial for aggravated murder. Id. at 20-21. In this context, this court's condemnation of common law marriage does not appear to be based on a public policy against cohabitation but is a further demonstration that the abolishment of common law marriage was to eliminate evidentiary proof problems.
As the majority notes, a person may change her name at common law by simply adopting another name. Pierce v. Brushart et. al., Board ofElections (1950), 153 Ohio St. 372, 380. The only restriction of this practice is that the name change must not be made for a fraudulent purpose. Id. When the common law name change procedure is used, there is no record of the name change with any court. Through the statutory name change procedure, each name change is recorded with the court in which the name change was granted. To promote the public policy of maintaining accurate records of people's legal names, we should liberally encourage the granting of name change requests and thereby not encourage the use of a common law name change to effectuate the same result.
A review of Ohio's statutory enactments and case law shows that the legislature has, in certain circumstances, granted extra protections to couples who cohabit. The General Assembly has defined "family or household member" in a manner that encompasses both married couples and unmarried couples who are cohabiting. Therefore, there is no public policy against cohabitation in this state.
In enacting our domestic violence statute, the General Assembly has shown its intention to grant the same protections to married couples and unmarried couples who are cohabiting. The domestic violence statute states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). R.C.2919.25(E)(1)(a)(i) defines "family or household member," as "a spouse, a person living as a spouse, or a former spouse of the offender." The statute further defines a "person living as a spouse" as "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or whootherwise has cohabited with the offender within five years prior to thedate of the alleged occurrence of the act in question." (Emphasis added.) R.C. 2919.25(E)(2).
Therefore, the legislature has recognized cohabitation without the benefit of marriage as reason to provide the same protections for victims of assault as are possessed by those that are married. Domestic violence carries harsher penalties than assault. Assault occurs when one person causes physical harm or attempts to cause physical harm against any another person. See R.C. 2903.13. Domestic violence occurs when a person causes or attempts to cause physical harm to "a family or household member." See R.C. 2919.25. In general, first offenses under both statutes are first degree misdemeanors. See R.C. 2903.13(C) and 2919.25(D). However, a second offense under the domestic violence statute is a fifth degree felony. See R.C. 2919.25(D). There is no analogous provision for assault in R.C. 2903.13. The supreme court has found that in the context of domestic violence, the essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium.State v. Williams (1997), 79 Ohio St.3d 459, paragraph two of the syllabus, reconsideration denied, 80 Ohio St.3d 1438.
Our legislature also granted special recognition of cohabiting couples without any sense of condemnation when it enacted R.C. 2907.02. This statute states, "It is not a defense to a charge * * * [of rape] that the offender and the victim were married or were cohabiting at the time of the commission of the offense." R.C. 2907.02(G).
In the area of child custody, in which public policy plays an important role, cohabitation between unmarried partners has not been censured. Ohio courts have found that cohabitation between romantic partners who are not married is not sufficient reason, in and of itself, to change custody; rather, in order to have relevancy to a child custody decision, this behavior must be shown to have an adverse impact on the child. See Krausv. Kraus (1983), 10 Ohio App.3d 63 (change in custody not allowed where evidence did not show that custodial parent's live-in boyfriend had an adverse impact on children); Wyss v. Wyss (1982), 3 Ohio App.3d 412
(immoral conduct or cohabitation of a custodial parent with a non-spouse may not form the basis for a change in custody unless there is a showing of a material adverse effect on the child); Whaley v. Whaley (1978),61 Ohio App.2d 111 (change in custody from mother to father was improper where it was ordered to punish the mother for conduct the court considered morally wrong); In re Burrell (1979), 58 Ohio St.2d 37, 39
(finding that absent evidence showing a detrimental impact upon her children, mere fact that mother was living with her boyfriend did not support characterization of her children as "dependent"). Therefore, in matters of child custody, evidence of cohabitation is not relevant unless it is shown to have adversely affected the child.
As unsettling as it may seem, these legislative and judicial decisions demonstrate that rather than condemning cohabitation between unmarried couples, those who set public policy recognize that this behavior is not a reason to discriminate or offer less protection in the eyes of the law.
 The Denial of Appellants' Requested Name Changes Does Virtually Nothing to Protect the Sanctity of Solemnized Marriages
The decision of the trial court, as affirmed by the majority opinion, also finds that the denial of these name change requests protects the rights of married persons and the sanctity of solemnized marriage. The majority describes marriage as "the ultimate expression of commitment and love" and the "bedrock upon which our society has built and continues to build upon." The majority opinion seems to imply that the trial court's decision to withhold approval of this name change between partners who are cohabiting but are not married is justified as a way to protect or promote the sanctity of solemnized marriage.
There is an apparent concern that granting a name change to appellants would give appellants marital status. However, granting appellants' their requested name changes will not entitle them to the legal privileges that we associate with the marital commitment. Having the same last name does not make two people married. Siblings share the same last names, as do distant cousins, and complete strangers. Conversely, more and more married couples are choosing to have different last names. I fail to see how refusing appellants' petitions for name changes protects the institution of marriage in any meaningful way.
 The Real Issue: Whether the Court May Deny a Same-Sex Couple's Request to Share the Same Name
The real controversy before this court is whether same-sex partners, living together in a committed relationship, may be denied their request to share the same name. The unspoken argument against granting appellants' requests for name changes is that it might be equated to approval of the appellants' alternative lifestyle and that the trial court is entitled to withhold such approval as it deems proper.
In significant areas of criminal and domestic law, the courts have not discriminated against persons based on sexual orientation. As explained below, same-sex couples enjoy special protection in criminal law under our current domestic violence statute. Moreover, sexual orientation, in and of itself, does not negatively affect adoption rights or child custody rights.
The domestic violence statute, R.C. 2919.25, protects same-sex couples who cohabit. State v. Yaden (1997), 118 Ohio App.3d 410, 417; State v.Hadinger (1991), 61 Ohio App.3d 820, 823. When considering, as an issue of first impression, whether the domestic violence statutes applied to same-sex couples who cohabit, the Tenth District Court of Appeals explained:
 While the trial court apparently imposed the requirement that persons to be charged pursuant to R.C. 2919.25 have the ability to marry, such does not appear to be the case given the broad language of the statute. Given the language of R.C. 2919.25, this court concludes that the legislature intended that the domestic violence statute provide protection to persons who are cohabiting regardless of their sex. We believe that to read the domestic statute otherwise would eviscerate the efforts of the legislature to safeguard, regardless of gender, the rights of victims of domestic violence.
Hadinger at 823. The First District Court of Appeals has also determined that same-sex couples who cohabit should be protected by the domestic violence statutes, noting the following:
 We can see no tangible benefit to withholding this statutory protection from same-sex couples. Furthermore, R.C. 2919.25 has been amended four times since Hadinger [which applied R.C. 2919.25 to a same-sex cohabiting couple] was decided. We can safely assume that the legislature was fully aware of the Hadinger decision when it drafted these amendments. Thus, the legislature implicitly endorsed Hadinger when it declined to alter the definition of "cohabit" to exclude same-sex couples. (Citation omitted.)
Yaden at 416-17. Ohio courts and our legislature have acknowledged that same-sex couples who cohabit are to be considered families for the purpose of applying our domestic violence statute.
The supreme court has held that an unmarried homosexual male may adopt a child. In re Adoption of Charles B. (1990), 50 Ohio St.3d 88, 92
(reversing a court of appeals split decision, finding that, as a matter of law, homosexuals are not eligible to adopt).
Ohio courts have stated that sexual orientation is generally irrelevant to decisions regarding child custody and visitation. In Inscoe v. Inscoe
(1997), 121 Ohio App.3d 396, 417, the Fourth District Court of Appeals determined that a trial court had abused its discretion by granting a request for modification of custody that was based upon the fact that the child's father had entered into "an openly gay life-style since the prior decision" and that "the same has adversely affected the parties' minor child." The court of appeals determined that a parent's sexual orientation, standing alone, has no relevance to a decision concerning allocation of parental rights and responsibilities. Id. at 413. Similarly, Ohio courts have found that sexual orientation, in and of itself, is not sufficient reason to justify a denial of visitation. InConkel v. Conkel (1987), 31 Ohio App.3d 169, the court of appeals determined that a homosexual father could not be denied overnight visitation with his two sons on the basis of his homosexuality without evidence that the boys would be psychologically or physically harmed thereby. Reviewing these cases, it is clear that moral objections to an adult's sexual orientation, in and of themselves, are not reasons to grant, deny, or modify that adult's custodial care of a child.
 Concluding Thoughts
In significant ways the legislature and judiciary have protected the rights of persons regardless of sexual behavior and sexual orientation. Our domestic violence statutes protect persons who are cohabiting, regardless of marital status or sexual orientation. In custody and dependency proceedings, cohabitation between unmarried partners and sexual orientation are irrelevant, absent a showing that this behavior has an adverse impact on the child. Single homosexuals are allowed to adopt children. Yet, the majority finds that appellants are not entitled to a name change.
The majority states that it cannot consider the best interest of a child who is unborn. But that does not mean that the court cannot consider the intention of the parties to have a child when considering their name change requests.
I would find that the trial court's denial of appellants' applications for name changes constituted an abuse of discretion as this decision was not adequately supported by law. I disagree with the court's decision on its legal grounds alone. There may be a sufficient legal basis upon which the trial court could have relied in denying appellants' requests, but the trial court's explanation, as affirmed by the majority opinion here, lacks such a basis. Therefore, I would reverse and remand this case to the trial court to determine whether there was a legal reason to deny appellants' requests.