INSCOE, Appellant,

v.

INSCOE, Appellee.

[Cite as *Inscoe v. Inscoe* (1997), 121 Ohio App.3d 396.]

Court of Appeals of Ohio,
Fourth District, Meigs County.

No. 95 CA 12.

Decided June 16, 1997.

**400**

_____

*Lambda Legal Defense and Education Fund, Inc.*, and *Patricia M. Logue*, for appellant.[1]

*Christopher E. Tenoglia*, for appellee.

*Rita S. Fuchsman*, for *amici curiae.*[2]

_____

1. Different counsel represented appellant during the trial court proceedings.

2. *Amicus curiae* in support of appellant include the Ohio Human Rights Bar Association, the American Academy of Child and Adolescent Psychiatry, the Ohio Psychological Association, and the National Association of Social Workers.

*Per Curiam.*

This is an appeal from a Meigs County Common Pleas Court judgment granting a motion for modification of parental rights and responsibilities concerning the parties' child from Herbert E. Inscoe, plaintiff below and appellant herein, to Bonnie L. Inscoe, defendant below and appellee herein.

Appellant assigns the following errors:

First Assignment of Error:

"The trial court abused its discretion when it found changed circumstances to warrant considering a modification of custody."

Second Assignment of Error:

"The trial court abused its discretion by disallowing testimony from former judge Charles Knight relating to the issue of changed circumstances."

Third Assignment of Error:

"The trial court abused its discretion by ordering a modification of custody."

Fourth Assignment of Error:

"The trial court abused its discretion by modifying custody based on a finding that appellant's sexual orientation or 'openly gay life–style' had adversely affected his son."

Fifth Assignment of Error:

"The trial court abused its discretion by entering a post–hearing psychological report into evidence, under seal, without allowing cross–examination of its author."

Sixth Assignment of Error:

"The trial court abused its discretion in its conduct of an interview of the minor child and in sealing the interview from the parties."

Seventh Assignment of Error:

"The trial court abused its discretion and erred as a matter of law in setting appellant's wages at $50,000 for child support purposes, without evidence or documentation."

The parties married in 1983 and have one child born in 1984. On July 5, 1988, appellant filed a complaint for divorce. On October 31, 1988, the trial court granted appellant a divorce and awarded him custody of the child.

The parties filed two motions in the fall of 1993. On October 15, 1993, appellant filed a motion to establish child support. In the motion, appellant noted that although the trial court awarded him custody of the child in 1988, the trial

court did not issue a child support order at that time. On November 12, 1993, appellee filed a motion for an order granting her visitation with the child every weekend, during the summer months, and every holiday.

On December 16, 1993, the trial court held a hearing on the two motions. The record transmitted on appeal does not include a transcript of that hearing. On January 11, 1994, the trial court filed an agreed entry granting appellee visitation with the child for three weekends a month and during the summer months and denying appellant's motion for child support.

On December 28, 1994, appellee filed a motion for contempt and for modification of parental rights and responsibilities. In the motion, appellee explained that appellant had denied appellee the right to exercise visitation with the child on several occasions. Appellee also alleged that "the current living conditions to which said child is being subjected are not in the best interest of the child." In an affidavit attached to the motion, appellee explained that appellant has not permitted her to have overnight visitation with the child since November 6, 1994, and allowed her to see the child for only one hour on each of four dates— November 22, December 4, December 9, and December 11.

On January 25, 1995, appellant filed a *pro se* motion requesting the trial court to, *inter alia*, (1) transfer the case to the Cabell County Common Pleas Court in Huntington, West Virginia, (2) modify the visitation order to enable the child to participate in sports and extracurricular activities, (3) modify the visitation order to require appellee herself to supervise all visitations, (4) hold appellee in contempt for "harassing and slandering" appellant, (5) grant an order of child support, and (6) order a home investigation of both parties.

On February 3, 1995, the trial court ordered Jeanie Weeks of the Meigs County Department of Human Services to conduct home investigations of both parties and ordered appellant to take the child to Shawnee Mental Health for a psychological examination and/or testing.

On March 30, 1995, the trial court held a hearing on appellee's December 28, 1994 motion and appellant's January 25, 1995 motion. At the beginning of the hearing, appellant requested the court to conduct an *in camera* interview of the child. In response to appellant's request, the court stated:

"I will do that when we are finished with this matter, and I will do that alone. I am going to tell both parties that I never ask the child who the child wants to live with. Make sure everybody understands that from the beginning."

Immediately after making the above comment, the trial court noted that appellant had called former Meigs County Common Pleas Court Judge Charles Knight to testify that at the time he issued the January 11, 1994 agreed visitation order, he was aware of appellant's sexual preference. When appellee's counsel

declined to stipulate to Knight's expected testimony, the court indicated that the court would call Knight as a witness. During Knight's testimony, however, appellee objected to the following question posed by the court:

"At the time you heard this case, did you have any knowledge of the sexual preference of the Plaintiff, Herbert Eugene Inscoe?"

Appellee argued that the record should speak for itself. Appellee further argued that "the witnesses certainly have the opportunity themselves to say what was disclosed" to the trial court prior to the January 11, 1994 visitation order. The trial court agreed with appellee and sustained the objection to its own question.

Appellee called appellant to testify on cross-examination. Appellant testified that (1) Charles Hatfield is his companion, (2) Hatfield is technically the owner of the pet store where they both work, (3) Hatfield can do anything he wants to do with the pet store, (4) appellant's parents gave the pet store to appellant and Hatfield, (5) appellant and Hatfield are a family, (6) the pet store is their family business, (7) appellant is an employee at the pet store, and (8) "what is mine is Charles' and what is Charles' is mine."

Chesapeake School District counselor Danny O. Newman II testified that he counseled the child at least ten times. Newman further testified that the child initiated all but the first counseling session. When Newman began to discuss the content of the counseling sessions, appellant raised an objection on the ground that the sessions constitute privileged communications between Newman and the child. To resolve the privilege issue, the trial court interviewed the child in the courtroom with no one except the court reporter present. During the interview, the child indicated to the court that he did not want Newman to reveal the content of the counseling sessions. The child told the court, "I don't want you talking to him."

During the interview, the trial court also seized the opportunity to question the child as follows regarding his wishes and concerns with respect to the allocation of parental rights and responsibilities:

"Q. * * * Do you like it at Dad's?

"A. Yeah.

"Q. Do you?

"A. It is pretty good.

"Q. Pretty good?

"A. Yeah, pretty good.

"* * *

"Q. * * * Well, let me ask you this, are you pretty happy with your life right now?

"A. A little bit.

"Q. A little bit? Could it be better?

"A. Yeah.

"Q. Let me ask you, if you had one thing in the world . . .

"A. I already know that question.

"Q . . . . one thing in the world that you could get, what would . . . This is one thing in the world to make your life better. Okay? One thing to make your life better. What would it be?

"A. Hopefully to have a home to live in.

"Q. A home to live in?

"A. Yeah.

"Q. Well, where do you live now?

"A. Dad's.

"Q. Dad's. Has he got a home there to live in?

"A. Yeah.

"Q. Do you? Okay.

"A. So does my Mom.

"Q. Your mom does too?

"A. Yeah.

"Q. Okay. Well, do you like your mom's place?

"A. Yeah.

"Q. Okay. Do you like your dad's?

"A. Yeah. I like them both.

"* * *

"Q. Okay. Okay. Well, so you say if you had the one thing in the world to make you happy, you'd like to have a home to live in?

"A. Yeah.

"* * *

"Q. You mean for you alone or . . .

"A. No.

"Q. No? You and who else?

"A. Nobody. Just me.

"Q. Huh?

"A. Just me.

"Q. Just you by yourself?

"A. Yeah.

"Q. Okay. Okay.

"A. But sometimes my friends would come over.

"* * *

"Q. Okay. Well, if you had any one thing in the world you could change to make you happy, what in the world would that be?

"A. Uh, drop out of school maybe.

"Q. No, you can't do that. This is something that you could legally do, not something . . .

"A. Oh.

"* * *

"Q. * * * What would you do, the one thing in the world to make you happy?

"A. I'm thinking. (Pause) A new car.

"Q. What?

"A. Get a car.

"Q. Get a car?

"A. Yeah.

"Q. You are not old enough to drive.

"A. I know.

"Q. A car for who?

"A. Motorcycle now. I could get a motorcycle.

"Q. Huh?

"A. I would get a motorcycle.

"* * *

"Q. Okay. You are happy with the way things are going?

"A. Yeah.

"Q. Yeah. Is there anything you'd want to change?

"A. Oh, maybe.

"Q. What?

"A. Uh, . . . Uh, . . . (Pause) I don't know.

"Q. Tell me if there is something you'd want to change to make things better for you, tell me.

"A. Oh, sometimes I'd like to live with mom.

"Q. Sometimes you would?

"A. Yeah.

"Q. Okay. For how long is that?

"A. I don't know. Just whenever I get mad. That is almost every day.

"Q. When you get mad. That is almost every day. Well, what do you get mad about?

"A. Oh, nothing. Just my sister.

"Q. Huh?

"A. She gets . . . . My sister gets on my nerves." (Ellipsis *sic.*)

We note that earlier in the interview, the child said that he "likes it * * * pretty good at Dad's." The trial court then began a series of "what would make your life better" questions. In answer to the first such question, the child said that he wanted a home of his own. In answer to the second such question, the child said that he wanted to "drop out of school maybe." When the trial court asked the question a third time, the child said he wanted a car, and then said he wanted a motorcycle. When the trial court asked the same question a fourth time the child commented, "Oh, sometimes I'd like to live with mom." The reason he stated for his occasional desire to live with his mom was that he becomes "mad" when "my sister gets on my nerves."

Appellee presented several more witnesses. Rayetta Shank testified that appellee and the child have a "very close, very loving, very caring" relationship. On cross-examination she testified that she has never met appellant. Appellee's niece Brenda Perdue described appellee as a "very good mother." Perdue testified that there have been times when the child has cried and thrown fits when he did not want to return to appellant's home after visitation with appellee. Perdue also described as follows an incident in which the child did not want Perdue's arm around him:

"Q. Me and my husband was sitting in the back of my grandmother's car. They had came to pick me and my husband up to spend the day with them. And

I put my arm around Herbie. He asked me not to, so I took my arm from Herbie.

"After I took my arm from Herbie, my husband put his arm around Herbie and like patted him like a pal pat. When he did that, he told my husband that he did not want his arm around me because I ... or my arm around him because I was a girl, and my husband was a guy and that was okay." (Ellipsis *sic.*)

On cross-examination, Perdue testified that she knew nothing about the relationship between appellant and the child, and "I am not saying he is a bad father."

Appellee testified that at the time of the December 16, 1993 hearing, appellant told her "that he was sick, was going to die of AIDS, and that he was going to go down the road and commit suicide." She further testified that in October 1993, she first learned of appellant's sexual preference. On cross-examination, appellee testified that her nephew Clarence Lykins had been accused of assaulting the child. We note that other evidence in the record reveals that Lykins sexually assaulted the child. Appellee further testified that Lykins lives "just above me." Appellee acknowledged that a criminal action was filed against Lykins. Appellee admitted calling appellant a "dick sucker" in front of the child.

Appellant called four witnesses, including himself. Jeanie Weeks, the Meigs County Common Pleas Court investigator, testified that she conducted an investigation of the parties. The trial court indicated that it had read Weeks's report of the investigation and would consider it as evidence. In the report, Weeks wrote as follows:

"I found nothing to indicate that Herbie's well-being was at risk in his father's household. I recommend that Herbie resides [*sic* ] with his father. I feel that he is most capable of caring for Herbie both financially and physically. * * *"

Regarding the parties' finances, Weeks wrote:

"Mrs. Inscoe is employed at Advance Auto Parts at 5720 Rt. 60, Huntington, W.Va. She works shift work which can consist of any of four different shifts which can be during the hours of 8 a.m. to 9 p.m. during the week and 8 a.m. to 10 p.m. on weekends. She earns $5.50 per hour. * * *

"* * *

"Mr. Inscoe indicated that he was employed at the Pet Barn which is owned by Mr. Hatfield. Mr. Inscoe earns $4.25 per hour and works approximately 32 hours per week. * * * Mr. Inscoe indicated that both his income and Mr. Hatfield's income were combined in the running of the household. Mr. Inscoe indicated that the total household gross income is approximately $100,000 per year."

Neither party objected to the admission of the report into evidence.

Appellant's father testified that appellant and his son have a very good relationship. Appellant's father further testified that Charles Hatfield and the child have a good relationship. With regard to appellant and Hatfield's sexual orientation, appellant's father testified as follows:

"Well, I've heard people say, you know, Herb and Charlie is gay and all this, and they might do something to the kids and all this, you know. It is a bunch of malarkey. None of that thing happens. Not even one time. Not one incident that I've ever been around."

Appellant's father further testified that appellant's sexual orientation does not adversely affect his role as a father.

She–Mae Inscoe, appellant's thirteen-year-old daughter, testified that she has lived with appellant all of her life. She denied that her father ever behaved in an inappropriate way in front of her and her half-brother Herbie. She further testified that her father's sexual orientation does not prevent him from having a good relationship with his children. When asked how she would feel if Herbie had to leave, she testified, "I would just feel lost." Last, She–Mae testified that Charles Hatfield has a good relationship with Herbie.

Charles Hatfield testified that he and appellant are companions who have lived together for two years. Hatfield further testified that appellant has a good relationship with his two children. With regard to the pet store business, Hatfield testified on cross-examination in pertinent part as follows:

"Q. And this business, how long have you been running this business down at the puppy shop or whatever it is referred to?

"A. Almost two years.

"Q. Two years. And you two are owners?

"A. Yes.

"Q. And since your ... I assume you share everything and all that, he is half owner and you are half owner, is that correct?

"A. (No audible response)

"Q. Is this a corporation, or a partnership, or what sort of a ...

"A. It is in my name.

"Q. It is in your name, but you two share everything, right?

"A. Uh-huh.

"Q. And you share the profits, and you share the losses, and the heartaches, and all the problems that ...

"A. Right." (Ellipsis *sic.*)

Appellant testified that he does not have AIDS. He further testified that his sexual orientation was discussed at his final divorce hearing. Appellant explained, "They knew that I was gay. They had my boyfriend there." Appellant explained that his sexual orientation does not harm his son, and has not prevented his son from doing well in school or having a good relationship with his sister.

With regard to appellee's testimony that her nephew Clarence Lykins was accused of assaulting the child, appellant testified as follows:

"Q. Do you have any information regarding Children Services' investigation, whether any allegation of abuse were [*sic*] substantiated?

"A. Yes, I do.

"Q. Okay. And were they substantiated or unsubstantiated?

"A. Uh, yes. As far as being sexually assaulted, yes, they are substantiated and we will be going to court."

After both parties rested, the trial court announced that it would order a psychological report concerning the child and seal the report. On April 25, 1995, the court issued an order requiring appellant to transport the child to Marietta, Ohio, for a psychological evaluation by psychologist J. Michael Harding. Harding evaluated the child and filed his report with the trial court on July 13, 1995. The report provided:

"*Observations*

"I observed Herbie interacting with both his father and his father's friend. It appeared as if he has a relatively good relationship with both men, and they [*sic*] each of the men have little difficulty relating to Herbie. Herbie seemed to be at ease when discussing general topics with his father and his father's friend. However, it is clear that Herbie is not comfortable discussing his father's sexual orientation with either his father or his father's friend. Mr. Inscoe indicates that he has discussed his sexual orientation with Herbie to the extent that it is necessary in order for Herbie to understand what it means to be gay. It is felt, however, that it is very difficult for a 10–year–old to understand what it means to be gay, and to accept it as a typical way of expressing one's sexuality. Ten-year-olds typically have difficulty understanding sexuality, in general, so it is expected that they would have even greater difficulty understanding what it is like to be gay or lesbian. It is difficult for many adults to understand the socio-sexual preferences of persons who are gay and lesbian. Given the prejudices and biases that are generally aimed at persons with sexual orientations that are alternatives

to heterosexual orientations, it is understandable why Herbie seems to experience undue stress and discomfort when discussing this topic.

"Summary and Conclusion

"* * *

"Based upon test results, Herbie's self-report, and observations, it is apparent that Herbie experiences anxiety and discomfort when discussing his father's sexual orientation. The same is true about his mother's interracial relationship. However, it appears that he is considerabl[y] more disturbed by his father's sexual orientation than by his mother's interracial relationship. This is based upon the fact that he discussed the latter at length, without any visible signs of stress or anxiety. He refused to discuss his father's sexual orientation to the same extend [sic].

"Herbie has been sexually molested by an older cousin. Given this fact, along with the discomfort that he expresses about his father's sexuality, it is this psychologist's opinion that Herbie may be at greater risk for emotional distress when dealing with issues of sexuality than when dealing with issues of race. Thus, it is felt that the potential for his father's sexual orientation and lifestyle poses a relatively greater risk for causing Herbie emotional distress that his mother's interracial relationship, all else being equal. Herbie indicates that he enjoys being at his mother's and father's homes equally. He says that he has more toys at his mother's home, however. Thus, he stated no preference regarding which parent he lives with most of the time."

We note that the psychologist did not make a recommendation on parental rights and responsibilities allocation and did not find that appellant's sexual orientation adversely affects the child. The psychologist merely indicated that due to the child's age, due to the prejudices and biases that are generally aimed at persons with alternative sexual orientations, and due to the fact that the child has been sexually molested by an older cousin, there is a possibility that the child "may be at greater risk for emotional distress when dealing with issues of sexuality than when dealing with issues of race." We note that the child did not state to the psychologist a preference regarding who should be the child's residential parent.

On July 19, 1995, the trial court entered judgment granting appellee's motion to modify the parties' parental rights and responsibilities and setting appellant's wages at $50,000 for child support determination purposes. The court wrote:

"The court has carefully considered O.R.C. Section 3109.04(E) in that the court cannot modify a prior order allocating parental rights unless a change in circumstances has occurred since the last order and the modification is in the best interest of the child. O.R.C. Section 3109.04(E)(1)(a). Further, the court consid-

ered the harm likely to be caused by the change and whether the same is outweighed by the advantages of the reallocation of parental rights. O.R.C. Section 3109.04(E)(1)(a)(iii). After careful consideration, *the court finds that respondent has entered into an openly gay life-style since the prior decision as to parental rights and that the same has adversely affected the parties' minor child* in such a manner that a change in the allocation of parental rights is in the best interest of said child. Further movant's interracial relationship has had little, if any, effect on the child." (Emphasis added.)

Other than finding that appellant's sexual orientation has adversely affected the child, the trial court made no specific findings to support its judgment granting appellee's motion for modification of parental rights and responsibilities and setting appellant's wages as $50,000 for child support determination purposes.

Appellant filed a timely notice of appeal.

## I

We will consider appellant's first, third, and fourth assignments of error together. In his first assignment of error, appellant asserts that "the trial court abused its discretion when it found changed circumstances to warrant considering a modification of custody." In support of this assignment of error, appellant argues that no new facts were presented at the hearing that would justify removing the child from appellant's home. Appellant contends that he presented uncontradicted testimony to prove that Judge Knight knew about appellant's sexual orientation at the time of the prior hearing and, therefore, the evidence concerning appellant's sexual orientation is not "new" evidence.

In his third assignment of error, appellant asserts that "the trial court abused its discretion by ordering a modification of custody." In his fourth assignment of error, appellant asserts that "the trial court abused its discretion by modifying custody based on a finding that appellant's sexual orientation or 'openly gay lifestyle' had adversely affected his son." In support of these two assignments of error, appellant argues that even if circumstances have changed, the trial court may not modify the allocation of parental rights and responsibilities unless modification is necessary to serve the child's best interests and the advantages of modification outweigh the harm of modification.

R.C. 3109.04(E)(1)(a) governs modifications of allocations of parental rights and responsibilities. The statute provides as follows:

"The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children *unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the*

*prior decree,* that a change has occurred in the circumstances of the child, his residential parent, or either of the parents subject to a shared parenting decree, *and that the modification is necessary to serve the best interest of the child.* In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

"* * *

"(iii) *The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.*" (Emphasis added.)

█ Thus, a trial court may not modify an allocation of parental rights and responsibilities unless the court finds (1) that a change in circumstances has occurred since the last decree, (2) that modification is necessary to serve the best interest of the child, and (3) that the harm likely to be caused by the modification is outweighed by the advantages of the modification.

█ In *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 674 N.E.2d 1159, paragraph one of.the syllabus, the court emphasized as follows that R.C. 3109.04 requires a finding of a change of circumstances:

"R.C. 3109.04 requires a finding of a 'change in circumstances.' Such a determination when made by a trial judge should not be disturbed, absent an abuse of discretion."

Although the *Davis* court rejected the notion that the change of circumstances must be substantial, the *Davis* court held that the change of circumstances "must be a change of substance, not a slight or inconsequential change," before the trial court may find that the change of circumstances warrants a modification of parental rights and responsibilities. *Id.,* 77 Ohio St.3d at 418, 674 N.E.2d at 1162.

█ The *Davis* court held that trial courts must be given wide latitude when considering allocations of parental rights and responsibilities. *Id.,* paragraph two of the syllabus. The court wrote:

"In determining whether a 'change' has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her—including many of the factors in this case—and such a decision must not be reversed absent an abuse of discretion. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846.

"The standard for abuse of discretion was laid out in the leading case of *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376

N.E.2d 578, but applied to custody cases in *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus:

" 'Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court. (*Trickey v. Trickey* [1952], 158 Ohio St. 9, 47 O.O. 481, 106 N.E.2d 772, approved and followed.)'

"The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page. * * *" *Id.*, 77 Ohio St.3d at 418, 674 N.E.2d at 1162.

Thus, we may not reverse a judgment allocating parental rights and responsibilities unless the judgment constitutes an abuse of the trial court's discretion. In determining whether a trial court abused its discretion, we must determine whether the judgment is not supported by credible and competent evidence.

We note that an abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181; and *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. When applying the abuse-of-discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *In re Jane Doe 1; Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, citing *Buckles v. Buckles* (1988), 46 Ohio App.3d 102, 546 N.E.2d 950.

In the case *sub judice*, the trial court explained its decision by noting that appellant had entered into "an openly gay life-style since the prior decision" and that "the same has adversely affected the parties' minor child." We will first address the trial court's finding that appellant had entered into "an openly gay life-style since the prior decision."

Although the parties debate whether Judge Knight was aware of appellant's sexual orientation at the time of the prior custody hearing, we find that issue to be irrelevant to this appeal. A parent's sexual orientation, standing alone, has no relevance to a decision concerning the allocation of parental rights and responsibilities. In *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 119, 15 O.O.3d 136, 141, 399 N.E.2d 1270, 1275–1276, we quoted with approval from a law review article, Lauerman, Nonmarital Sexual Conduct and Child Custody (1977), 46 U.Cin.L.Rev. 647, 681, concerning child custody law in Ohio:

"Professor Lauerman sums up what we believe is the law in Ohio.

" 'In sum, the direct adverse impact approach to custody cases involving parental nonmarital sexual conduct is the soundest, provided certain limitations

on its application are adopted. Courts should consider only present impact. *Before depriving a sexually active parent of custody, courts should demand preponderance proof that the parent's conduct is having or is probably having an effect on the child and that the effect is actually harmful.* Without such proof, the fact of nonmarital sexual conduct should not justify a custody denial or change. Moreover, on the issue of harmfulness, the primary focus should be on the child's present physical and psychological welfare and developmental potential. Unless accompanied by clearly adverse collateral consequences, moral impact should be ignored.' " (Emphasis added.)

During the nearly two decades since *Whaley,* courts throughout Ohio have steadfastly held to the principle that a parent's conduct has no relevance to the allocation of parental rights and responsibilities in the absence of proof that the parent's conduct has adversely affected the child. The Ohio Supreme Court has twice cited *Whaley* with approval. See *Pater v. Pater* (1992), 63 Ohio St.3d 393, 398, 588 N.E.2d 794, 799; *In re Charles B* (1990), 50 Ohio St.3d 88, 92, 552 N.E.2d 884, 887–888. Other appellate districts have cited *Whaley* with approval. See *Rowe v. Franklin* (1995), 105 Ohio App.3d 176, 663 N.E.2d 955; *Kraus v. Kraus* (1983), 10 Ohio App.3d 63, 10 OBR 73, 460 N.E.2d 680; *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 3 OBR 479, 445 N.E.2d 1153; *In re Rex* (1981), 3 Ohio App.3d 198, 3 OBR 226, 444 N.E.2d 482. We have followed *Whaley* numerous times. See *Conkel v. Conkel* (1987), 31 Ohio App.3d 169, 31 OBR 335, 509 N.E.2d 983; *Sellman v. Sellman* (Sept. 26, 1996), Highland App. No. 95 CA 888, unreported, 1996 WL 557553; *In re Riffle* (Jan. 31, 1990), Meigs App. No. 417, unreported, 1990 WL 9947; *Townsend v. Townsend* (June 5, 1990), Lawrence App. No. 1876, unreported; *Masters v. Masters* (Feb. 7, 1989), Gallia App. No. 88 CA 7, unreported, 1989 WL 11899; *Lee v. Lee* (Aug. 15, 1988), Washington App. No. 87 CA 8, unreported, 1988 WL 85102.

Pursuant to *Whaley* and the numerous cases citing *Whaley,* a parent's conduct has no relevance to the allocation of parental rights and responsibilities in the absence of proof that the parent's conduct has adversely affected the child.

In *Conkel,* we applied our *Whaley* rationale to a parent's sexual orientation. We wrote as follows:

"[Appellant's] contentions constitute an unconstitutional 'status' argument, *i.e.,* that the appellee father's status as a homosexual man establishes conclusive proof of a judicial abuse of discretion. This court rejects such an argument. See *Robinson v. California* (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758. Secondly, [appellant's] contentions posit an irrebuttable presumption of unfitness based on sexual activity. This court has already rejected that argument in *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 15 O.O.3d 136, 399 N.E.2d 1270. Such an irrebuttable presumption offends the constitutional standards of *Stanley*

[*v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551] and *Lehr* [*v. Robertson* (1983), 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614], *supra.* In *Whaley, supra,* this court held that the issue of immoral conduct is relevant only to the extent that it affects the child. *Such conduct can be considered in the grant of custody or modification of custody only if the conduct of the parent has a direct adverse impact on the child."* (Emphasis added.) *Id.,* 31 Ohio App.3d at 171, 31 OBR at 336, 509 N.E.2d at 985.

A trial court determining the allocation of parental rights and responsibilities may consider a parent's sexual orientation only if the sexual orientation has "a direct adverse impact" on the child. Accord *Mohrman v. Mohrman* (1989), 57 Ohio App.3d 33, 565 N.E.2d 1283; *Phillips v. Phillips* (Mar. 20, 1995), Preble App. No. CA94–03–005, unreported, 1995 WL 115426; *Large v. Large* (Dec. 2, 1993), Franklin App. No. 93AP–735, unreported, 1993 WL 498127.

In *Conkel,* we underscored the necessity that the adverse impact be direct. Courts may not consider adverse impact on a child that flows from the unpopularity of gays and lesbians in our society. In *Conkel,* we wrote as follows:

"This court cannot take into consideration the unpopularity of homosexuals in society when its duty is to facilitate and guard a fundamental parent-child relationship. The Supreme Court of the United States faced the question of popular disapproval in 1984 in the case of *Palmore v. Sidoti* (1984), 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421. In *Palmore,* the trial court removed a white child from her natural mother because the white mother was cohabiting with a black man, whom she later married. The white father relied on the issue of social stigma. The Supreme Court recognized that such a child might 'be subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin.' Nonetheless, Chief Justice Burger, in overruling the trial court, wrote: ' * * * The Constitution cannot control such prejudices but neither can it tolerate them. *Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.* * * *' The Supreme Court of Alaska in May 1985 applied the *Palmore* case to a lesbian mother custody case, *S.N.E. v. R.L.B.* (Alaska 1985), 699 P.2d 875. The court held: '[I]t is impermissible to rely on any real or imagined social stigma attaching to [the] Mother's status as a lesbian. * * *' *Id.* at 879." (Emphasis added.) *Id.,* 31 Ohio App.3d at 173, 31 OBR at 338–339, 509 N.E.2d at 987.

In *Conkel,* we noted that in *Palmore,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421, the United States Supreme Court prohibited courts from directly or indirectly giving effect to private biases. When determining an allocation of parental rights and responsibilities, a trial court must disregard adverse impact on the child that flow from society's disapproval of a parent's sexual orientation.

We must now determine whether the record contains sufficient evidence to support a conclusion that since the time of the prior decision, appellant's sexual orientation has directly and adversely affected the child in such a manner that a change in the allocation of parental rights and responsibilities is necessary to serve the best interest of the child. We note that the only factor the trial court explicitly mentioned and relied on in its judgment was appellant's openly gay lifestyle and its adverse impact on the child.

The investigator's report does not support a conclusion that appellant's sexual orientation has directly and adversely affected the child. The investigator recommended that the child continue to live with appellant.

The psychologist's report does not support a conclusion that appellant's sexual orientation has directly and adversely affected the child. The psychologist did not make a recommendation and did not find that appellant's sexual orientation adversely affects the child. Rather, the psychologist indicated that due to the child's age, due to the prejudices and biases that are generally aimed at persons with alternative sexual orientations, and due to the fact that the child has been sexually molested by an older cousin, there is a possibility that the child "may be at greater risk for emotional distress when dealing with issues of sexuality than when dealing with issues of race." We note, however, that none of the three causes of the child's possible emotional distress relates directly to appellant's sexual orientation. Neither the first cause (the child's age) nor the third cause (the fact that the child has been sexually abused by an older cousin) has anything to do with appellant's sexual orientation. In view of *Palmore*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421, we may not directly or indirectly give effect to the second cause—the prejudices and biases that are generally aimed at persons with sexual orientations that are alternatives to heterosexual orientation.

None of the witnesses testified that appellant's sexual orientation has directly and adversely affected the child in such a manner that a change in the allocation of parental rights and responsibilities is necessary to serve the best interest of the child. Although appellee's niece testified about an incident in which the child did not want her arm around him, but accepted her husband's arm around him, we note that no one testified that the arm incident is linked directly to appellant's sexual orientation, and no one testified that the arm incident directly and adversely caused the child harm.

The trial court's *in camera* interview with the child does not support such a conclusion. As we discussed above, only when the trial court asked virtually the same question a fourth time did the child comment, "Oh, sometimes I'd like to live with mom." The reason for his occasional desire to live with his mom was that he becomes "mad" when "my sister gets on my nerves." The child did not

mention appellant's sexual orientation as a reason why the child "sometimes" would like to live with appellee.

In conclusion, we find no evidence in the record to support a conclusion that since the prior decision, appellant's sexual orientation has directly and adversely affected the child in such a manner that a change in the allocation of parental rights and responsibilities is necessary to serve the best interest of the child. We again note that a parent's sexual preference, standing alone, is not a sufficient basis to modify the allocation of parental rights and responsibilities. Thus, we agree with appellant that the trial court erred by granting appellee's motion for modification of the allocation of parental rights and responsibilities on the ground stated by the trial court—that appellant's sexual orientation has adversely affected the child. For that reason, we reverse the trial court's judgment. We express no opinion, however, regarding whether other grounds not expressly stated by the trial court might exist to support appellee's motion for modification. We note that although the trial court mentioned in its judgment entry the statute that lists the factors a court must consider when making allocations of parental rights and responsibilities, the trial court in the case *sub judice* appears to have focused solely on appellant's sexual orientation.

On remand, the trial court shall make a new decision on appellee's motion after considering all the factors listed in R.C. 3109.04(F)(1), all the evidence already included in the record, and any new evidence that the parties may wish to present relevant to the time period since the March 30, 1995 hearing. In accordance with relevant statutes, the trial court may also conduct a new *in camera* interview of the child, may order a new home investigation, and/or may order a new psychological report before making its decision.

Accordingly, based upon the foregoing reasons, we sustain appellant's first, third, and fourth assignments of error.

## II

In his second assignment of error, appellant asserts that "the trial court abused its discretion by disallowing testimony from former judge Charles Knight relating to the issue of changed circumstances." Appellant argues that he sought Judge Knight's testimony to confirm his own testimony that Judge Knight was aware of appellant's sexual orientation at the time of the prior hearing.

In *State v. Johnson* (Dec. 26, 1995), Ross App. No. 94 CA 2004, unreported, 1995 WL 764319, we cautioned against calling judges to testify about previous cases. We wrote:

"Because Judge Radcliffe claims to have no personal knowledge about the case *sub judice,* he could have testified only concerning information he had learned by

virtue of his position as judge in a juvenile court custody matter involving appellant's son. In order to compel the testimony of a judge concerning matters learned solely in his or her official capacity as a judge, the proponent of the testimony must demonstrate that the judge's testimony is necessary and must demonstrate that no other witnesses could testify about the same matters. *Hirschberger v. Silverman* (1992), 80 Ohio App.3d 532, 541, 609 N.E.2d 1301, 1306. These limitations on the testimony of judges are necessary for several reasons. First, there is a danger that a jury might give the testimony of a judge greater weight than the jury gives the testimony of other witnesses. *Id.* Second, compelling a judge to testify concerning knowledge gained in the judge's official capacity might reflect adversely on the integrity of the judiciary. *Id.*"

In the case *sub judice*, appellant made no allegation that Judge Knight would testify about any information outside that which he learned in his official capacity as judge. Thus, it appears that appellant wished Judge Knight to testify about matters he learned in his official capacity as judge. Appellant, however, did not demonstrate that no other witnesses could testify about whether Judge Knight was aware of appellant's sexual orientation at the time of the prior hearing. Quite to the contrary, appellant testified that his sexual orientation was discussed at his final divorce hearing. Appellant explained, "They knew that I was gay. They had my boyfriend there." For these reasons, we find no error with the trial court's decision excluding Judge Knight's testimony.

Additionally, we note that in *Hirschberger v. Silverman* (1992), 80 Ohio App.3d 532, 609 N.E.2d 1301, the court argued against using a judge's testimony to explain a prior judgment. The court wrote as follows:

"We also hold that since a court speaks only through its journal, a judge cannot testify as to the meaning or intent of his decision in a case or explain aspects of the decision further." *Id.*, 80 Ohio App.3d at 540, 609 N.E.2d at 1306.

To use Judge Knight's testimony to explain aspects of his prior decision, including but not limited to whether he was aware of appellant's sexual orientation, would be improper.

Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

## III

In his fifth assignment of error, appellant asserts that "the trial court abused its discretion by entering a post-hearing psychological report into evidence, under seal, without allowing cross-examination of its author." In support of this assignment of error, appellant cites R.C. 3109.04(C), which provides:

"Prior to trial, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of each parent and may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations. *The report of the investigation and examinations shall be made available to either parent or his counsel of record not less than five days before trial,* upon written request. The report shall be signed by the investigator, and *the investigator shall be subject to cross-examination* by either parent concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation." (Emphasis added.) See, also, *Roach v. Roach* (1992), 79 Ohio App.3d 194, 607 N.E.2d 35.

In the case *sub judice,* at the conclusion of the March 30, 1995 hearing, the trial court announced that it would order a psychological report on the child and announced that it would order the psychological report to be sealed. Neither of the parties raised an objection to the trial court's announcements in this regard. On July 13, 1995, the psychologist filed a sealed report of his examination of the child.

On December 26, 1995, appellant filed a motion in our court for release of copies of the sealed portions of the record, including the *in camera* interview of the child, the psychologist's report, and the home investigation. On April 16, 1996, we entered judgment holding that pursuant to R.C. 3109.04(C), the parties should be given copies of the psychologist's report and the home investigation.

For three reasons, we find no reversible error concerning the admission of the psychological report. First, we note that neither party objected to the trial court's announcement that it would order and seal a posthearing psychological evaluation of the child. It is axiomatic that a litigant's failure to raise an issue in the trial court waives the litigant's right to raise that issue on appeal. *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 463. To allow appellant to waive the psychological report argument at trial and then revive it on appeal would frustrate the orderly administration of justice. As the Ohio Supreme Court stated in *State v. 1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 170, 522 N.E.2d 524, 527:

"The legitimate state interest in orderly procedure through the judicial system is well recognized as founded on the desire to avoid unnecessary delay and to discourage defendants from making erroneous records which would allow them an option to take advantage of favorable verdicts or to avoid unfavorable ones."

Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process.

■ Second, we note that we have already ordered that copies of the psychological report be released to the parties. Appellant used the psychological report when preparing his brief on appeal. Thus, appellant has suffered no prejudice as a result of the trial court's posthearing sealing of the psychological report.

Third, we note that the psychological report does not change the result of this case. As we discussed under appellant's first, third, and fourth assignments of error, the psychological report does not support a conclusion that appellant's sexual orientation has directly and adversely affected the child. Thus, the fact that the trial court admitted the psychological report into evidence, if error, constitutes harmless error. We note that Civ.R. 61 provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceedings must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Because the admission of the psychological report did not affect appellant's substantial rights, we must disregard any error that might have occurred regarding the admission of the report.

Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.

## IV

■ In his sixth assignment of error, appellant asserts that "the trial court abused its discretion in its conduct of an interview of the minor child and in sealing the interview from the parties." Again, we note that on December 26, 1995, appellant filed a motion for release of copies of the sealed portions of the record, including the *in camera* interview of the child. On April 16, 1996, we entered judgment holding, *inter alia,* that the parties should be given copies of the *in camera* interview of the child. We reasoned that if the legislature had intended to deny the parents access to a transcript of their child's *in camera* interview, the legislature could have clearly stated that in R.C. 3109.04(B). We further reasoned that without access to a transcript of the *in camera* interview, a parent cannot effectively challenge a trial court's determination of the reasoning ability of the child interviewed. For these reasons, we find merit to appellant's

argument that the trial court erred by sealing the *in camera* interview from the parties.

We note that we decline to follow decisions from two other districts concerning parents' access to *in camera* interviews of their children. In *Patton v. Patton* (Jan. 9, 1995), Licking App. No. 94 CA 40, unreported, 1995 WL 42497, the court wrote:

"Although the above provision contemplates a party obtaining a 'recorded statement' from a child, *i.e.* a tape recording, it also expresses the legislature's intent in enacting R.C. 3109.04(B)(3) to proscribe all parties from gaining access to the recorded in-chambers interview."

In *In re Longwell* (Aug. 30, 1995), Lorain App. Nos. 94 CA 6006 and 94 CA 6007, unreported, 1995 WL 520058, the court wrote:

"We believe that judges should be allowed to keep their private conversations with the children of divorced parents confidential, as many times it is only this promise of confidentiality that convinces these embattled children to speak freely. * * * "

While we understand the rationale and purpose between the *Patton* and *Longwell* decisions, we believe that those decisions read into R.C. 3109.04 language that simply is not there. Although we agree that children may be more candid and forthright during a confidential interview, we must not construe R.C. 3109.04 to achieve a result beyond the clear language of the statute.

We emphasize that we may not "restrict, constrict, qualify, narrow, enlarge, or abridge" the clear meaning of a statute. In *Wachendorf v. Shaver* (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E.2d 370, paragraph five of the syllabus, the court held:

"The court must look to the statute itself to determine legislative intent, and if such intent is clearly expressed therein, the statute may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act, and in the absence of any definition of the intended meaning of the words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." See, also, *State ex rel. Smith v. Columbus* (1986), 28 Ohio St.3d 94, 28 OBR 189, 502 N.E.2d 608; *State ex rel. McGraw v. Gorman* (1985), 17 Ohio St.3d 147, 17 OBR 350, 478 N.E.2d 770.

With regard to the trial court's conduct of the interview, appellant complains that the trial court never asked the child the ultimate question regarding whether he would prefer to live with appellant or appellee. Appellant

contends that R.C. 3109.04(B) requires the trial court to ask the ultimate question.

R.C. 3109.04(B) provides:

"(B)(1) * * * In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, *shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.*" (Emphasis added.)

We disagree with appellant's contention that the statute requires trial courts to ask children whether they would prefer to live with their mother or father. The statute merely requires trial courts to interview children "regarding their wishes and concerns with respect to the allocation" of parental rights and responsibilities. The statute does not require trial courts to ask any particular questions or employ any particular method of questioning the children. In Baldwin's Ohio Domestic Relations Law (1991) 375, Section 15.05(C), the author observed:

"R.C. 3109.04 does not set forth a procedure to be followed in determining the child's wishes and concerns and does not specify when the interview should be conducted. These matters are left to the discretion of the trial court."

We find no abuse of discretion in the case *sub judice*. The trial court's method of questioning the child did not violate the letter or the spirit of the statute. The trial court asked questions sufficient to ascertain the child's wishes and concerns with respect to the allocation of parental rights and responsibilities. The trial court not only asked the child a series of questions about what one thing the child would change in his life to make his life better, the trial court also asked the child detailed questions about the time he spends with each parent. Hence, we find no merit to appellant's contention with regard to the trial court's conduct of the *in camera* interview.

Accordingly, based upon the foregoing reasons, we sustain in part and overrule in part appellant's sixth assignment of error.

## V

In his seventh assignment of error, appellant asserts that "the trial court abused its discretion and erred as a matter of law in setting appellant's wages at $50,000 for child support purposes, without evidence or documentation." Appellant contends that no evidence supports the $50,000 wage figure. Appellant further contends that the trial court failed to make findings required by R.C. 3113.215 to support the imputation of income. Appellant notes that R.C. 3113.215(B)(5)(e) specifically states that trial courts making child support calcula-

tions must not include any income earned by a parent's spouse. Appellant cites *Scheeler v. Fink* (Nov. 16, 1993), Ross App. No. 1928, unreported, 1993 WL 481386, in which we held that before a trial court may impute income to a parent, the trial court must find that the parent is voluntarily unemployed or underemployed.

 Appellee concedes that a trial court may not impute income to a parent unless the trial court finds that the parent is voluntarily unemployed or underemployed. Appellee argues that the record includes sufficient evidence to support a finding that appellant is underemployed.

For the reasons we stated in our discussion of appellant's first, third, and fourth assignments of error, we are reversing and remanding this case for redetermination by the trial court. When redetermining appellee's motion for modification of the allocation of parental rights and responsibilities, the trial court may need to redetermine the matter of child support. We note, however, that we agree with appellant that the trial court erred by setting appellant's wages at $50,000.

In *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 601 N.E.2d 496, the court held that the court must follow R.C. 3113.215 "literally and technically in all material respects." The court wrote as follows:

"2. The terms of R.C. 3113.215 are mandatory in nature and must be followed literally and technically in all material respects.

"3. Any court-ordered deviation from the applicable worksheet and the basic child support schedule must be entered by the court in its journal and must include findings of fact to support such determination." *Id.*, paragraphs two and three of the syllabus.

In *Rock v. Cabral* (1993), 67 Ohio St.3d 108, 616 N.E.2d 218, syllabus, the court held as follows:

"Whether a parent is 'voluntarily underemployed' within the meaning of R.C. 3113.215(A)(5), and the amount of 'potential income' to be imputed to a child support obligor, are matters to be determined by the trial court based upon the facts and circumstances of each case. The determination will not be disturbed on appeal absent an abuse of discretion."

In *Rock*, the court repeated the *Marker* holding that court-ordered deviations from the child support schedule and worksheet are not permitted unless the court fully and strictly complies with the statute.

R.C. 3113.215 permits the trial court to impute income to a party under certain circumstances. The statute provides:

"(A)(5) 'Potential income' means both of the following for a parent that the court, or a child support enforcement agency pursuant to sections 3111.21 and 3111.22 of the Revised Code, determines is voluntarily unemployed or voluntarily underemployed:

"(a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the parent's employment potential and probable earnings based on the parent's recent work history, the parent's occupational qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides;

"(b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant."

In *Rock*, the court emphasized that before a trial court may impute income to a parent, the trial court must make a finding that the parent is voluntarily unemployed or underemployed.

In *Leonard v. Erwin* (1996), 111 Ohio App.3d 413, 676 N.E.2d 552, we likewise emphasized that before a trial court may impute income to a parent, the trial court must make a finding that the parent is voluntarily unemployed or underemployed. We wrote:

"In spite of evidence regarding appellant's and appellee's income, the referee inexplicably decided to impute income to both parties in the amount of the minimum wage in order to complete the child support worksheet. We believe that this was error for two reasons. First, *the lower court must find that a party is voluntarily unemployed or underemployed before it can impute any income to that party.* See R.C. 3113.215(A)(5). No such finding was expressly made in this case, especially with regard to appellant. And, second, once a party is found to be voluntarily unemployed or underemployed, the potential income to be imputed to that party must be determined in accordance with the considerations listed in R.C. 3113.215(A)(5)(a). The lower court's decision to use the minimum wage, as opposed to an amount calculated after considering the factors in R.C. 3113.215(A)(5)(a), was not supported by the record." (Emphasis added.) *Id.*, 111 Ohio App.3d at 417, 676 N.E.2d at 555.

Thus, the trial court must make a finding of voluntary unemployment or voluntary underemployment before imputing income. Unless the trial court makes a finding of voluntary unemployment or underemployment, the trial court may not impute income to a parent. Accord *Franke v. Franke* (May 1, 1996), Highland App. No. 95 CA 879, unreported, 1996 WL 230570; *Ritchhart v. Phillips* (July 24, 1991), Ross App. No. 1725, unreported, 1991 WL 136742;

*Parkins v. Parkins* (Jan. 24, 1990), Hancock App. No. 5–88–18, unreported, 1990 WL 7956.

In the case *sub judice*, the trial court failed to make a specific finding that appellant is voluntarily unemployed or underemployed before imputing income to appellant. Accordingly, we find that the trial court erred by imputing income to appellant.

We note that it appears that the trial court arrived at the $50,000 income figure for appellant by dividing by two the $100,000 total household income listed in the investigator's report for the household that appellant shares with Charles Hatfield. When responding to this assignment of error, appellee noted appellant's testimony that "what is mine is Charles' and what is Charles' is mine." We further note that appellant equated his relationship with Hatfield to a marriage.

To the extent that appellant and Hatfield's relationship is the equivalent of a marriage, and to the extent that the trial court imputed a portion of Hatfield's income to appellant, we find that the trial court erred. R.C. 3113.215(B)(5)(e) specifically states that trial courts may not include a new spouse's income when calculating a parent's gross income for child support purposes. The statute states:

"(B)(5) When a court computes the amount of child support required to be paid under a child support order * * * all of the following apply:

"* * *

"(e) When the court or agency calculates the gross income of a parent, it shall not include any income earned by the spouse of that parent." Accord *Havre v. Havre* (Nov. 29, 1996), Portage App. No. 96–P–0058, unreported, 1996 WL 762004; *Ryan v. Osman* (Nov. 22, 1996), Lake App. No. 95–L–198, unreported, 1996 WL 702472; *Seaver v. Ameduri* (Mar. 20, 1996), Mahoning App. No. 94 C.A. 179, unreported, 1996 WL 133006; *In re Carr* (Mar. 24, 1994), Franklin App. No. 93APF07–1147, unreported, 1994 WL 109695.

We note that cases to the contrary predate R.C. 3113.215(B)(5)(e), which first became effective on April 12, 1990. See *Esber v. Esber* (1989), 63 Ohio App.3d 394, 579 N.E.2d 222; *Snyder v. Snyder* (1985), 27 Ohio App.3d 1, 27 OBR 1, 499 N.E.2d 320.

■ Although trial courts may not consider a new spouse's income when calculating a parent's gross income for purposes of child support, trial courts may consider the benefits a parent receives from a new spouse or from sharing living expenses with another person when deciding whether to deviate from the amount of child support that would otherwise be required by the statute. R.C. 3113.215(B)(3)(h) provides:

"The court, in accordance with divisions (B)(1) and (2)(c) of this section, may deviate from the amount of support that would otherwise result from the use of the schedule and the applicable worksheet in division (E) of this section, through line 24, or in division (F) of this section, through line 23, in cases in which the application of the schedule and the applicable worksheet in division (E) of this section, through line 24, or division (F) of this section, through line 23, would be unjust or inappropriate and would not be in the best interest of the child. In determining whether that amount would be unjust or inappropriate and would not be in the best interest of the child, the court may consider any of the following factors and criteria:

"* * *

"(h) Benefits that either parent receives from remarriage or sharing living expenses with another person." Accord *Ricker v. Ricker* (1995), 102 Ohio App.3d 209, 212, 656 N.E.2d 1337, 1338; *Ryan v. Osman* (Nov. 22, 1996), Lake App. No. 95–L–198, unreported, 1996 WL 702472; *Pruce v. Pruce* (Jan. 11, 1996), Cuyahoga App. No. 69261, unreported, 1996 WL 11309; *Pelikan v. Pelikan* (July 1, 1993), Cuyahoga App. No. 62962, unreported, 1993 WL 243076.

Before considering the benefits a parent receives from remarriage or from sharing living quarters with another person, however, the trial court must first make findings that the amount calculated pursuant to the child support schedule (1) would be unjust or inappropriate and (2) would not be in the best interest of the child. See R.C. 3113.215(B)(1) and (B)(2)(c). In the case *sub judice,* the trial court made neither finding. Thus, to the extent that the trial court considered the benefits appellant receives from his relationship with Hatfield, the trial court erred.

Accordingly, based upon the foregoing reasons, we sustain appellant's seventh assignment of error.

## VI

In summary, we again note that upon remand, the trial court shall make a new decision on appellee's motion after considering all the factors listed in R.C. 3109.04(F)(1), all the evidence already included in the record, and any new evidence that the parties may wish to present relevant to the time period since the March 30, 1995 hearing. In accordance with relevant statutes, the trial court may also conduct a new *in camera* interview of the child, may order a new home investigation, and/or may order a new psychological report before making its new decision. Additionally, as we discussed under appellant's seventh assignment of

error, the trial court shall, if necessary, recalculate the child support obligations of the parties in accordance with R.C. 3113.215.

*Judgment accordingly.*

PETER B. ABELE and KLINE, JJ., concur.

HARSHA, J., concurs in part and dissents in part.

HARSHA, Judge, concurring in part and dissenting in part.

Initially, I note that appellant has not complied with App.R. 12(A)(2) and 16(A)(7). The latter requires a separate argument for each assignment of error set forth in the brief, while the former provides that an appellate court may disregard any assignment of error for which an appellant fails to make a separate argument. See *Park v. Ambrose* (1993), 85 Ohio App.3d 179, 186, 619 N.E.2d 469, 474; *State v. Newberry* (1991), 77 Ohio App.3d 818, 820, 603 N.E.2d 1086, 1087–1088; and *Vaughters v. Vaughters* (May 1, 1997), Scioto App. No. 96CA2412, unreported, 1997 WL 224891. Appellant's failure to comply with the Appellate Rules could, by itself, justify affirming the trial court. *Id.* Nonetheless, I believe the interests of justice require us to consider the merits.

Appellant's first assignment of error contends that the trial court lacked jurisdiction even to entertain the motion for a modification of parental rights and responsibilities. While the majority agrees, I cannot. R.C. 3109.04(E)(1)(a) is not so restrictive as appellant would have us believe. The change-of-circumstances test does not focus solely on new conduct or relationships. The focus more properly is upon the then current effect of both new actions and any change in effect upon the child by previously existing conditions. For instance, if the residential parent had a drinking problem at the time of initial determination, but it was not adversely affecting the child, surely a court would not be required to ignore the same drinking problem if it were to later manifest itself in an adverse impact upon the child. The statute speaks in terms of "change * * * in the circumstances of the child * * *." R.C. 3109.04(E)(1)(a). Just as importantly, while appellant's sexual orientation may have remained the same, the personal relationship in which he is involved has not. The record implies that he now has a different partner.

In my mind, either of these changes, *i.e.*, the change in impact of his orientation or the new interpersonal relationship is sufficient to vest jurisdiction with the trial court.

In all other regards, I concur in the judgment and opinion.