**BEAVER, Appellant,**

v.

**BEAVER, n.k.a. Weaver, Appellee.**

[Cite as *Beaver v. Beaver* (2001), 143 Ohio App.3d 1.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 00CA31.

Decided May 25, 2001.

*Michael D. Buell,* for appellant.

*Michele Hilden Willard,* for appellee.

_____

PETER B. ABELE, Presiding Judge.

This is an appeal from a Washington County Common Pleas Court judgment. The court granted a motion by Sandra D. Weaver, defendant below and appellee herein, to modify a prior judgment that allocated parental rights and responsibilities. Jeffrey C. Beaver, plaintiff below and appellant herein, raises the following assignment of error for review:

"The trial court erred when it changed custody of Jeffrey Beaver to his mother."

Our review of the record reveals the following facts pertinent to the instant appeal. On April 10, 1990, the parties married. One child was born as issue of the marriage: Jeffrey G. Beaver, born October 15, 1990. In March 1993, the parties divorced and the trial court designated appellant as the residential parent. Both parties subsequently remarried. Appellee and her new husband have two children. Appellee continued to remain involved in Jeffrey's life.

On the evening of October 23, 1999, appellee received a phone call from the home room mother at Jeffrey's school. The home room mother stated that appellant and his wife "were on the internet in some very disturbing poses that [appellee] needed to see." Appellee subsequently discovered appellant's internet website titled "JokersRealm.com." The website contained photographs of an explicit sexual nature.[1] Appellee learned that appellant and his wife appeared on the website.

On November 24, 1999, appellee filed a motion to modify the trial court's prior allocation of parental rights and responsibilities. Appellee alleged that a change in circumstances had occurred and that designating appellee as Jeffrey's primary residential parent would serve Jeffrey's best interests. Appellee claims that appellant's recent website operation had the potential to morally, emotionally, and sexually damage her son, and thus constituted a change in circumstances sufficient to warrant a change in the prior allocation of parental rights and responsibilities. Appellee's motion did not specifically delineate how appellant's activities adversely affected her son.

_____

1. The website contained photographs of women in various states of undress and of a man's naked body from the waist down. The majority of the photographs depicted nude women. Appellant admitted that he was the man who appeared in the photographs.

On February 24, 2000, the trial court held a hearing to consider appellee's motion. In support of her motion, appellee presented her own testimony and the testimony of two fellow Wal–Mart employees. The employees testified about the content of appellant's website. The two Wal–Mart employees did not, however, have any information regarding the effect, if any, that the website had on Jeffrey. Appellee likewise testified as to the content of the website. She further explained her concerns about Jeffrey's remaining in appellant's care. Appellee stated:

"I think my biggest issue with this is it is—it's morally wrong. I don't want Jeffrey growing up thinking that your body is—it's not something to be ashamed of, but it is private and, for your self-respect and your self-esteem, I don't think it's right to sell it, whether it be in books, magazines or across the internet."

Appellee stated that Jeffrey did not seem to know much about the website. She explained that "[a]ll he could tell me [about the website] was that there was his dad and a bunch of babes on the front and two squiggly marks that he thought was lightning at the top of it." Appellee opined that appellant's operation of the website adversely affected Jeffrey, causing Jeffrey to become upset and to perform poorly in school.

Washington County Children Services ("WCCS") caseworker Gina Karwatka testified that she received a referral involving appellant's operation of the website. She explained that WCCS became involved due to the concern that Jeffrey may have been a subject of the website. Karwatka stated that her investigation revealed that Jeffrey had not, in any manner, been involved with the website. Karwatka further stated that as part of her investigation, she interviewed Jeffrey and he denied any contact with his father's website. Karwatka stated that after the interview, she had no concerns as to whether the website had affected Jeffrey. Karwatka further stated:

"[Jeffrey] seemed like a very good kid. I think I remember talking to [appellant] about that afterward, that he seemed like a well—he was very well-mannered, he was respectful. He told me that—that he loved both of his parents and he was very attached to his dad and—because I talked to him about being afraid at home or if things happened at home that he doesn't like. And he didn't express any concern or fear about his father's house."

Like Karwatka's testimony, and in contrast to appellee's testimony, appellant testified that he did not believe that his website operation had affected Jeffrey in any way or had affected appellant's ability to parent. Appellant further explained that he never had any problems with Jeffrey until Jeffrey learned that appellee filed the motion to modify the allocation of parental rights and responsibilities.

After presenting her evidence, appellee urged the trial court to modify the prior allocation of parental rights and responsibilities because the "poor moral atmosphere" may cause "other things" to happen to "put [Jeffrey's] upbringing at risk." Appellant countered that his alleged lack of morality could not properly serve as a basis for modifying the allocation of parental rights and responsibilities.[2]

After hearing the parties' arguments, the trial court issued a temporary order designating appellee as the residential parent. The trial court found "clear and convincing evidence that there has been a substantial impact on this child. He is not performing up to his capacity in school." At the conclusion of the hearing, the court further ordered appellant to undergo a "mental examination pursuant to Rule 35."

On April 24, 2000, the results of appellant's psychological evaluation were filed with the trial court. The psychologist interviewed appellant and also gave him several tests. During his evaluation, appellant told the psychologist that when appellant informed Jeffrey of the court's March 7, 2000 decision, Jeffrey became extremely upset and he did not calm down for nearly one and one-half hours.

After administering the various tests, the psychologist concluded that appellant is concerned about his son and that he enjoys activities with his son. The results of one of the tests revealed "a pervasive theme of loss and concern for his son" and that "[appellant] looks forward to the time when his son can return home with him."

The results of the Parent–Child Relationship Inventory revealed the following: (1) appellant had an "above-average" score on the Parental Support scale, meaning that he believes that he receives adequate practical help and emotional

---

2. In *Inscoe v. Inscoe* (1997), 121 Ohio App.3d 396, 700 N.E.2d 70, we followed established precedent and noted that unless a parent's sexual activity directly and adversely impacts the child, the parent's sexual activity ordinarily should not be a basis for modifying a prior allocation of parental rights and responsibilities:

" ' " * * * The direct adverse impact approach to custody * * * is the soundest, provided certain limitations on its application are adopted. Courts should consider only present impact. Before depriving a sexually active parent of custody, courts should demand preponderance proof that the parent's conduct is having or is probably having an effect on the child and that the effect is actually harmful. Without such proof, the fact of nonmarital sexual conduct should not justify a custody denial or change. Moreover, on the issue of harmfulness, the primary focus should be on the child's present physical and psychological welfare and developmental potential. Unless accompanied by clearly adverse collateral consequences, moral impact should be ignored." ' " (Emphasis deleted.) *Inscoe* at 413–414, 700 N.E.2d at 81, quoting *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 119, 15 O.O.3d 136, 141, 399 N.E.2d 1270, 1275–1276, quoting Lauerman, Nonmarital Sexual Conduct and Child Custody (1977), 46 U.Cin.L.Rev. 647, 681. See, also, *Whaley* (stating that a court's inquiry into the moral conduct of a parent is limited to a determination of the effect of such conduct on the child).

support as a parent, (2) appellant had a "high average" score on the Satisfaction with Parenting scale, indicating that appellant enjoys his child and enjoys being a parent, (3) appellant's score on the Involvement scale, which reflects the propensity to seek out the child and manifest an interest in the child's activities, was "well above average," indicating that appellant has "an above average interest in his child's activities," (4) appellant's score on the Communication scale, which represents the awareness of how well the parent communicates with the child and the parent's empathy, was "above average," (5) appellant's score on the Limit Setting scale, which measures the effectiveness and character of the parent's discipline techniques, was "high average," and (6) appellant's score on the Autonomy scale, which reflects the willingness to permit a child's independence, was in the "low average range."

The psychologist also observed appellant's interacting with Jeffrey. The psychologist noted:

"Initially, [appellant's] son sat close to him on a couch, while they looked at a book. They also played with cards on the floor. Jeffrey appeared close to his father and there was a relaxed and comfortable interchange between them. There also appeared to be good rapport between the two. They did exchange hugs, in an appropriate manner. When Jeffrey was ready to leave, he ran into his father's open arms with such force that he threw his father off balance."

The psychologist also interviewed Jeffrey. Jeffrey indicated "that he is 'OK' with living with his mother, but he really missed his father." The psychologist noted that Jeffrey "was unsure as to why he is now residing with his mother instead of his father." With respect to discipline, Jeffrey told the psychologist that "his father sits down and explains to him what he did wrong and tells him that he should not do it again." Jeffrey indicated that he believed that appellant's discipline method was effective. The psychologist then noted: "At this point, Jeffrey began to appear uncomfortable. Eventually, he did appear tearful and cried. Jeffrey then explained that he is not able to see his dad much and that he wants to see him much more." Jeffrey advised the psychologist that he would prefer to live with his father. Jeffrey explained that "if he was given a choice, he would like for things to be the way they were when he lived with his dad. He explained that he used to see his mother on weekends. He would then stay with her during the summer and see his father on weekends during the summer. Jeffrey 'liked it much better that way.' He stated that the way it is now, he does not see his father enough and he missed him very much."

Jeffrey also informed the psychologist that "it was difficult getting used to his new school" and that "[i]t was also hard to change schools. Jeffrey stated that he liked his old school better."

The psychologist also interviewed appellee. Appellee stated that she believes that appellant "is good to Jeffrey" and that " '[h]e's excellent at doing kid stuff with him.' "

The psychologist ultimately concluded that "there is no evidence that [appellant] would place his son in jeopardy or expose him to any type of pornography."

After the psychological report was filed, appellant, on April 26, 2000, filed a motion to rescind the temporary order of March 7, 2000. Appellant asserted that the report revealed that Jeffrey wants to return home to his father and that appellant shares a healthy, nurturing relationship with Jeffrey.

On July 18, 2000, the trial court issued its judgment and modified the prior allocation of parental rights and responsibilities and designated appellee as the residential parent. In reaching its decision, the trial court relied upon the results of the psychological examination. The trial court noted that the report demonstrated that appellant has "numerous personality problems and deficiencies." The court wrote:

"The summary of the father's MMPI–2 profile indicates characteristics such as resentment and hostility, difficulty appropriately expressing negative emotions, emotional instability, and the under-control of emotions. In addition, the profile shows egocentricity, a low frustration tolerance, and impulsiveness, as well as traits such as irresponsibility, rebelliousness, adventurousness, self-centeredness and unreliability. According to the psychologist's report, the father may tend to 'disregard the potential or actual consequences of actions and may not learn from experience. Acting out and antisocial behavior may include sexual acting out. He may tend to be childish, energetic, immature, shallow and talkative.' Other possible traits of the father, based on the psychologist's report, include aggressiveness, inflexibility about masculinity, doubts about masculinity, exhibitionism, self-indulgence, immaturity, opportunism, difficulty delaying gratification and problems with impulse control. The report finds that the father's 'relationships are apt to be superficial and insincere. He might provoke resentment and hostility in others.' "

Although the court did not explicitly state what it found to constitute a change in circumstances sufficient to warrant the modification, it appears that the court determined that the revelation of appellant's "numerous personality problems and deficiencies" constituted a change in circumstances. The court wrote:

"In this case, the parties' minor son did know that his father and stepmother had a web site, which he had the ability to access, that involved pictures of women and/or girls. The father's pornographic web site for profit was known to other parents of other children in the son's class at school. In fact, the teacher at the class eventually gained knowledge of this web site. The child has suffered

from scabies, which the father maintains was contracted through contact with the father's brother's dog, a mile down the road. The parties' son has had extensive visitation and interaction in his mother's home and community in the past several years, and is bonded with his mother and stepfather. Unbeknownst to this Court, prior to this time, the father does have significant psychological problems pursuant to the profile that was ordered post-hearing in this matter."

The trial court did not, however, explicitly address how the change in circumstance affected Jeffrey. Nevertheless, the court determined that modification was warranted. Appellant filed a timely notice of appeal.

In his sole assignment of error, appellant argues that the trial court erred by modifying the prior allocation of parental rights and responsibilities. Appellant argues that the trial court lacked authority to modify the prior allocation without a finding that a change in circumstances has occurred that negatively affects the child.

We initially note that when "an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus; see, also, *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159, 1162. Furthermore, a reviewing court should afford the utmost deference to a trial court's decision regarding child custody matters. See, *e.g., Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849. Consequently, absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding child custody. See, *e.g., Bechtol, supra.* When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1142. Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis*, 77 Ohio St.3d at 419, 674 N.E.2d at 1163.

While a trial court's discretion in a custody modification proceeding is broad, it is not absolute. The trial court must follow the procedure outlined in R.C. 3109.04. *Miller*, 37 Ohio St.3d at 74, 523 N.E.2d at 849. R.C. 3109.04(E)(1)(a) governs the modification of a prior decree of the allocation of parental rights and responsibilities. The statute provides:

"The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his

residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

"* * * *

"(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."

█ In determining whether to modify a prior allocation of parental rights and responsibilities, three factors generally guide a trial court's decision: (1) whether there has been a change in circumstances, (2) whether a modification is in the child's best interests, and (3) whether the benefits resulting from the change will outweigh any harm. See R.C. 3109.04(E)(1)(a); see, *e.g.*, *Clark v. Smith* (1998), 130 Ohio App.3d 648, 653, 720 N.E.2d 973, 976.

In *Davis*, 77 Ohio St.3d at 416–417, 674 N.E.2d at 1161, the court discussed the requirement of a "change in circumstances" and emphasized that a trial court's finding of whether a change in circumstances has occurred must not be disturbed absent an abuse of discretion. The court stated:

"R.C. 3109.04 requires a finding of a 'change in circumstances.' Such a determination when made by a trial judge should not be disturbed, absent an abuse of discretion. In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change, including a change in circumstances because of a child's age and consequent needs, as well as increased hostility by one parent (and that parent's spouse) which frustrates cooperation between the parties on visitation issues."

The *Davis* court continued:

"Clearly, there must be a change of circumstances to warrant a change of custody, and the change must be of substance, not a slight or inconsequential change. The nomenclature is not the key. As the *Wyss* court aptly stated:

" 'The clear intent of that statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment.' *Wyss* [*v. Wyss* (1982) ], 3 Ohio App.3d [412] 416 [3 OBR 479, 483], 445 N.E.2d [1153] 1157.

"In determining whether a 'change' has occurred, we are mindful that custody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846." *Davis*, 77 Ohio St.3d at 418, 674 N.E.2d at 1162.

Thus, not only must the change of circumstances be of consequence, but it also must relate to the child's welfare. See *Hanley v. Hanley* (May 22, 1998), Pickaway App. No. 97 CA 35, unreported, 1998 WL 372685. "Implicit in the definition of changed circumstances is that the change must relate to the welfare of the child." *Holtzclaw v. Holtzclaw* (Dec. 14, 1992), Clermont App. No. CA92–04–036, unreported, 1992 WL 368712.

Once a change in circumstances has been demonstrated, a trial court next must consider whether a modification will serve the child's best interests. R.C. 3109.04(F)(1) specifies the factors that a trial court should consider when determining a child's best interests:

"In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to:

"(a) The wishes of the child's parents regarding his care;

"(b) If the court has interviewed the child * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

"(c) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;

"(d) The child's adjustment to his home, school, and community;

"(e) The mental and physical health of all persons involved in the situation;

"(f) The parent more likely to honor and facilitate visitation and companionship rights approved by the court;

"(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

"(h) Whether either parent previously has been convicted of or pleaded guilty to [certain criminal offenses];

"(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent his or her right to visitation in accordance with an order of the court;

"(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."

■ If a trial court concludes that a change in circumstances has occurred and that a modification of the prior allocation of parental rights and responsibilities would serve the child's best interests, a trial court may not modify a custody order unless the court determines that the harm likely to be caused by a change of environment is outweighed by the benefits of the change of environment. R.C. 3109.09(E)(1)(a).

■ After our review of the record in the case *sub judice,* we believe that the trial court must conduct further proceedings and permit the parties to submit additional evidence for the court's consideration. First, we note that the trial court attached great significance to the psychologist's report. This report does include negative information concerning appellant's MMPI–2 profile and his personal "characteristics." A large portion of the report, however, casts appellant in a very positive light and illustrates the depth of the relationship between appellant and Jeffrey. Furthermore, additional consideration must be given to precisely how appellant's alleged psychological deficiencies affect his ability to function and to parent, and how these alleged deficiencies constitute a change in circumstances sufficient to warrant a custody modification. In other words, the record in the instant case provides little insight into how appellant's alleged psychological deficiencies have affected appellant's ability to parent Jeffrey and have affected Jeffrey's welfare. See *Hanley, supra.*

■ Second, we recognize that our difficulty stems from the fact that the psychologist did not testify but rather submitted a written report. Appellant notes that the psychologist's examination and report occurred after the trial on the merits; thus, he did not have the opportunity to cross-examine the psychologist and to address the issues raised in the psychologist's report. R.C. 3109.04(C) [3] and Civ.R. 75(D) [4] speak to psychological examinations of parties in

---

**3.** R.C. 3109.04(C) provides as follows:

"Prior to trial, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of each parent and may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations. The report of the investigation and examinations shall be made available to either parent or his counsel of record not less than five days before trial, upon written request. The report shall be signed by the investigator, and the investigator shall be subject to cross-examination by either parent concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation."

**4.** Civ.R. 75(D) provides as follows:

"On the filing of a complaint for divorce, annulment, or legal separation, where minor children are involved, or on the filing of a motion for the modification of a decree allocating

domestic relations proceedings. These provisions contain various procedural requirements. If a court chooses to consider the report as evidence, "due process requires that the trial court permit each party to cross-examine a court-appointed investigator whose report the trial court considers as evidence." *Webb v. Lane* (Mar. 15, 2000), Athens App. No. 99 CA 12, unreported, 2000 WL 290383; *Eitel v. Eitel* (Aug. 23, 1996), Pickaway App. No. 95CA11, unreported, 1996 WL 482703. Thus, parties should be given the opportunity to cross-examine the expert who prepared the report and to explore the nature and the scope of the expert's findings and conclusions. Of course, we recognize that parties could choose to submit a psychologist's report to the court without conducting an evidentiary hearing and without considering the psychologist's oral testimony. *Eitel*, citing *Corrigan v. Corrigan* (Dec. 30, 1986), Ross App. No. 1300, unreported, 1986 WL 15205. We find no such agreement or stipulation in the instant case, however.

We note that in *Eitel*, because the trial court fully complied with the procedural requirements outlined in Civ.R. 75(D) we upheld the trial court's use of an investigator's report in rendering its decision. A significant part of our rationale in upholding the trial court's use of the report rested upon the court-appointed investigator's availability for cross-examination. In contrast to *Eitel*, in *Webb* we held that the trial court erred when it admitted a guardian *ad litem*'s report post-hearing without allowing either party an opportunity to cross-examine the guardian *ad litem*.

In the case *sub judice*, it appears that neither party had the opportunity to cross-examine the psychologist and to explore the nature and the scope of the psychologist's findings and conclusions. Again, we note that the psychologist's examination and report appears to form the sole basis for the trial court's custody modification order. Thus, we believe that under the facts and circumstances present in the instant case, the parties must be permitted to fully explore how appellant's alleged psychological problems have affected appellant and Jeffrey's welfare. Additionally, on remand the parties should be permitted to present any other relevant evidence, including expert testimony, that they wish to submit to the court for consideration. We hasten to add, however, that our decision should not be construed as a comment on the merits of the custody modification issue.

---

parental rights and responsibilities for the care of children, the court may cause an investigation to be made as to the character, family relations, past conduct, earning ability, and financial worth of the parties to the action. The report of the investigation shall be made available to either party or their counsel of record upon written request not less than seven days before trial. The report shall be signed by the investigator and the investigator shall be subject to cross-examination by either party concerning the contents of the report. The court may tax as costs all or any part of the expenses for each investigation."

Accordingly, based upon the foregoing reasons we sustain appellant's assignment of error, reverse the trial court's judgment and remand the matter for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

HARSHA and EVANS, JJ., concur.